**BELL ATLANTIC–DELAWARE, INC., Plaintiff,**

v.

**Robert J. McMAHON, Chairman, et al., Defendants.**

**AT & T Communications of Delaware, Inc., Plaintiff,**

v.

**Bell Atlantic–Delaware, Inc., et al., Defendants.**

**No. 97–511–SLR, 97–616–SLR.**

United States District Court, D. Delaware.

Jan. 6, 2000.

William E. Manning, and Bonnie L. Metz, of Duane, Morris & Heckscher, Wilmington, Delaware. Counsel for Bell Atlantic–Delaware, Inc. Of Counsel: David A. Hill, of Bell Atlantic–Delaware, Inc., Wilmington, Delaware. John M. Walker, of Bell Atlantic Network Services, Inc., Washington, D.C. Lydia R. Pulley, of Bell Atlantic Network Services, Inc., Richmond, Virginia.

P. Clarkson Collins, Jr., and Barbara McDonald, of Morris, James, Hitchens & Williams, Wilmington, Delaware. Counsel for the Delaware Public Service Commission.

Wendie C. Stabler, and Scott J. Jensen, of Saul, Ewing, Remick & Saul, Wilmington, Delaware. Counsel for AT & T Communications of Delaware, Inc. Of Counsel: David M. Levy, Clinton F. Beckner, David L. Lawson, and Michael L. Post, of Sidley & Austin, Washington, D.C.

Pamela Davis Joseph, of Conectiv Communications, Wilmington, Delaware and Gregory A. Inskip, of Potter, Anderson & Corroon, LLP, Wilmington, Delaware. Counsel for Conectiv Communications, Inc. Of counsel: Peter Tannenwald, of Irwin, Campbell & Tannenwald, P.C., Washington, D.C.

Patricia A. Stowell, of the Delaware Division of the Public Advocate. Counsel for the Public Advocate.

Carl Schnee, and Virginia Gibson–Mason, of the United States Attorney's Office, Wilmington, Delaware. Counsel for United States. Of Counsel: Theodore C. Hirt, and David T. Zaring, of the United States Department of Justice, Civil Division, Federal Programs Branch, Washington, D.C.

## OPINION

SUE L. ROBINSON, District Judge.

### I. INTRODUCTION

This is a consolidated action consisting of appeals filed by Bell Atlantic–Delaware, Inc. ("Bell") and AT & T Communications of Delaware, Inc. ("AT & T") from two orders entered by the Delaware Public Service Commission ("the Commission"). The parties bring this action under § 252(e)(6) of the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996) ("Act" or "Telecommunications Act"), which provides for federal judicial review of state commission determinations made pursuant to the Telecommunications Act.

Bell challenges the Commission's order rejecting Bell's Statement of Generally Available Terms ("SGAT") and establishing prices under which Bell must agree to sell elements of its local telephone network to its competitors. Bell alleges that the Commission's order violates Bell's rights under the Act by setting prices for the use of Bell's services and network elements substantially below Bell's actual costs. Bell seeks a permanent injunction to prevent the individual Commissioners (sued in their official capacities only) from enforcing the Commission's order. Bell moves for summary judgment on its complaint. *See* Docket Item ("D.I.") 45.

Two of Bell's competitors, AT & T and Conectiv Communications, Inc. ("Conectiv"), have intervened in defense of the Commission on Bell's claims, but also have filed counterclaims challenging certain aspects of the Commission's SGAT Order. AT & T also has filed a separate appeal from the Commission's approval of an interconnection agreement between AT & T and Bell. AT & T challenges two aspects of the Interconnection Agreement as violative of the Telecommunications Act. Unlike Bell, AT & T has not submitted a formal motion relating to its appeal.

The Delaware Public Advocate has intervened to argue in support of the Commission's orders. For its part, the Commission has filed a motion to dismiss both Bell's and AT & T's appeals, arguing that the Telecommunications Act's provision for federal judicial review of state commission determinations violates the Eleventh Amendment. The Civil Division of the

United States Department of Justice has intervened to defend the constitutionality of the Act.

## II. THE TELECOMMUNICATIONS ACT OF 1996

### A. Overview

At issue are the "Development of Competitive Markets" provisions of the Telecommunications Act. *See* 47 U.S.C. §§ 251 and 252. These sections implement a "procompetitive, de-regulatory" framework designed to spur competition in local telephone markets. *See* S. Conf. Rep. No. 104–230, at 113 (1996). Local telephone markets typically are dominated by a single regulated monopoly, known as an Incumbent Local Exchange Carrier ("ILEC"), that owns all of the equipment and lines necessary to provide local telephone service. In order to foster competition in these markets, the Act preempts all state and local legal barriers to entry into the local telephone market, such as the exclusive local franchises formerly enjoyed by ILECs. *See* 47 U.S.C. § 253(a).

The Act also attempts to alleviate some of the natural barriers to entry in local telecommunications markets, such as ILEC monopoly control over "bottleneck" or "essential" facilities. Bottleneck facilities are those needed by any competitor seeking entry in the local telecommunications market. *See* Joseph D. Kearney & Thomas W. Merrill, *The Great Transformation of Regulated Industries Law,* 98 Colum. L.Rev. 1323, 1326 n. 6 (1998). Examples of such facilities are the copper wire "loops" that connect users to local telephone exchanges. *See id.* A local telephone network is composed of numerous "local loops"—cables strung on poles and buried underground—that connect each telephone subscriber to local or "central-office" switches that, in turn, route calls or "traffic" along the network and provide other features like call waiting and call forwarding. These central-office switches are connected to each other through "trunks" and other transport facilities. These and other facilities are integrated by various computer systems and databases that support network operations by providing connection to other telecommunications carriers and by coordinating marketing, billing, and collection. To compete in any meaningful way with an ILEC like Bell, a new entrant would have to construct its own fully redundant network (i.e., one coextensive with Bell's)—a prohibitively expensive and time-consuming task. *See* Joint Explanatory Statement of the Committee of Conference, H.R.Rep. No. 104–458, at 148 (1996). Moreover, even if a competitor installed its own telecommunications network, an ILEC has a powerful economic incentive "to discourage entry and robust competition by not interconnecting its network with the new entrant's network or by insisting on supracompetitive prices or other unreasonable conditions for terminating calls from the entrant's customers to the [ILEC's] subscribers." S. Conf. Rep. No. 104–230, at 113 (1996).

Because of these significant barriers to entry, Congress concluded that robust competition in local markets would occur only if the Act put new entrants on a level playing field by mandating interconnection and "unbundled" access to an ILEC's existing network. *See In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996,* 11 FCC Rcd. 15499 ¶¶ 11–12, at 11–12 (1996) (*"Local Competition Order"*). To this end, the Act establishes three mechanisms for entry into the local telephone market: (1) interconnection with an ILEC's network (2) the use of "unbundled" elements of an incumbent's network, and (3) resale of an ILEC's retail telecommunications services purchased at wholesale by the new entrant. *See* 47 U.S.C. § 251(c)(2), (3), (4). A competitor's use of all three mechanisms, depending upon economic exigencies, is possible. *See Local Competition Order* ¶ 12, at 12. Section 251 imposes specific obligations upon ILECs with respect to these three mechanisms, while

§ 252 establishes pricing standards appropriate to each strategy and procedures relating to interconnection agreements and SGATs.

### 1. Interconnection

Some competitors, such as cable companies, will have existing networks of their own that enable their subscribers to communicate with each other. *See id.* ¶ 13, at 12. Although these types of new entrants will have little need for an ILEC's services or facilities, a fair agreement with the ILEC will be required to enable the new entrant's customers to place calls to, and receive calls from, the ILEC's subscribers. *See id.* Sections 251(b)(5) and (c)(2), therefore, require ILECs to enter into interconnection agreements on just, reasonable, and nondiscriminatory terms. The Act also facilitates efficient interconnection by obligating ILECs to lease space on their premises so that a new entrant may "collocate" any of its equipment necessary for interconnection.[1] *See* 47 U.S.C. § 251(c)(6).

### 2. The Purchase of ILEC Network Elements

More often than not, new entrants will lack a fully redundant network of their own and, consequently, new entrants will be unable to compete with the ILEC. *See Local Competition Order* ¶ 14, at 13. To address this scenario, the Act authorizes new entrants to purchase elements of an ILEC's network on an "unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory."[2] 47 U.S.C. § 251(c)(3). This allows new entrants to fill in the gaps of their own network by purchasing pieces of an ILEC's network. These pieces are known as "unbundled network elements" or "UNEs." Section 252(d)(1) requires that an ILEC's charges for its network elements be based on the "cost (determined without reference to a rate-of-return or other rate-based proceeding[3]) of providing the ... network element." *Id.* § 252(d)(1). An ILEC's charges for UNEs may include a reasonable profit. *Id.* Congress left the job of determining how to calculate the cost of providing these services to the FCC. In its *Local Competition Order,* the FCC adopted a "forward looking cost methodology" (also known as the "total-element-long-run-incremental-cost" ("TELRIC") methodology) to calculate the cost of providing network elements.

Cognizant that some network elements are the product of cutting edge innovations and not wishing to stifle creativity, Congress limited a new entrant's ability to purchase these types of network elements. Accordingly, the Act requires the FCC to set standards governing access to "proprietary" network elements. *Id.* § 251(d). These standards, at a minimum, must take into account whether a new entrant's

---

1. The Act also requires collocation to permit new entrants access to an ILEC's network elements. *See* 47 U.S.C. § 251(c)(6).

2. The Act defines "network elements" as:

 [F]acilit[ies] or equipment used in the provision of a telecommunications service. Such term also includes features, functions, and capabilities that are provided by means of such facilit[ies] or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service.
 *Id.* § 153(29).

3. "Rate of return on rate base" is the traditional method of rate setting used by state utility regulators. "Rate base" is the original cost of a utility's plant in service, less the cost of depreciation and plus or minus other adjustments. *See* 26 Del. C. Ann. § 102(3) (Supp.1998). The Commission adds to the rate base a rate of return sufficient to allow the utility to attract new capital and pay a fair return on investment. *See Public Service Comm'n v. Wilmington Suburban Water Corp.,* 467 A.2d 446, 447–48 (Del.1983). Rates are set to recover the rate base, multiplied by the rate of return, plus the utility's actual operating expenses. *See* 26 Del. C. Ann. § 311; *Wilmington Suburban Water Corp.,* 467 A.2d at 447–48.

access is "necessary," *see id.* § 251(d)(2)(A), and whether denial of access to these elements would "impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." *Id.* § 251(d)(2)(B). In addition to protecting an ILEC's innovative network elements, this "necessary and impair" standard provides incentive for new entrants to develop their own innovative network elements, rather than simply purchasing (at cost-based prices) those developed by the ILECs.

### 3. Resale of Retail Services

The Act also requires an ILEC to sell its retail telephone services at wholesale prices to new entrants, so that these competitors can resell those services (at a profit) to their own customers. *Id.* § 251(c)(4). The resale price is the retail rate the ILEC charges its subscribers for the service less "the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier." *Id.* § 252(d)(3). The Act further mandates that ILECs permit competitors to collocate on an ILEC's premises "equipment necessary for interconnection or access to unbundled network elements." *Id.* § 251(c)(6).

### B. Implementation of the Act's Provisions

### 1. Voluntary Negotiations

Congress chose to rely primarily on private negotiations to implement the duties imposed by § 251. The Act charges ILECs with "the duty to negotiate in good faith ... the particular terms and conditions of agreements" with competitors who request interconnection, network elements, or services under § 251. *Id.* § 251(c)(1). Section 252 provides that an ILEC and a new entrant may "negotiate and enter into a binding agreement ... without regard" to any of the aforementioned pricing, technical, and quality standards set out in § 251(b) and (c). *Id.* § 252(a). Interconnection agreements reached through voluntary negotiation must be submitted to the state public utility commission for approval, but such agreements may be rejected only if they discriminate against a telecommunications carrier not a party to the agreement or if all or part of the agreement is not consistent with the public interest, convenience, and necessity. *Id.* § 252(e)(2)(A).

### 2. Compulsory Arbitration

Where an entrant and an ILEC cannot agree on all the terms of an interconnection agreement (as was the case here), either party may petition the relevant state public service commission to mediate any "open issues." A state commission, however, may decline this invitation, in which case the FCC must conduct the arbitration. *Id.* § 252(e)(5). If it agrees to participate in the arbitration, the state commission must settle any unresolved issue no later than nine months after the date of the first request for arbitration. *Id.* § 252(b)(4)(C). The Act provides a disincentive to state commission mediation by allowing the commission to reject agreements that do not "meet the requirements of section 251" of the Act. This grants a state commission broader discretion to reject agreements (in whole or in part) that do not comport with the duties imposed in § 251 and the pricing standards in § 252(d). The Interconnection Agreement reached between Bell and AT & T in the present case was arrived at through commission-assisted mediation.

### 3. Statement of Generally Available Terms

An ILEC also may offer all entrants a "Statement of Generally Available Terms" ("SGAT"). *See id.* § 252(f). This saves parties the time and expense of negotiating individual interconnection agreements. The relevant state commission (if it chooses to participate under the Act) must approve the SGAT and ensure that it complies with §§ 251 and 252(d) of the Act. *Id.* § 252(f)(2). If the state commission elects

to not review the SGAT, it is deemed approved within sixty days. *Id.* § 252(f)(3). In the present case, the Delaware Commission rejected the SGAT offered by Bell for, *inter alia,* failure to comply with the pricing standards imposed by § 252(d).

## III. PROCEEDINGS BEFORE THE DELAWARE COMMISSION

### A. The SGAT Proceeding

On December 16, 1996, Bell filed with the Commission an application for approval of its SGAT, along with supporting documentation and testimony. *See* Joint Appendix ("J.A.") 73–85. The filing included prices that Bell proposed to charge for its unbundled network elements as well as the wholesale rate it would charge for purchases of its services for resale. The Commission appointed two Hearing Examiners to review the SGAT. On April 7, 1997, after discovery, three rounds of expert testimony, and a week of live hearings (in which Bell, the Commission, AT & T, Conectiv, the Public Advocate, and other intervenors participated), the Hearing Examiners issued their decision. *See* Findings and Recommendations of the Hearing Examiners, PSC Doc. No. 96–324 (Apr. 7, 1997) ("First Report") (J.A. 1305–1427).

In their First Report, the Hearing Examiners concluded that Bell's proposed SGAT violated the standards imposed by the Telecommunications Act and, thus, recommended against approval of the SGAT by the Commission. The Examiners recommended disapproval of the SGAT primarily because Bell based its proposed rates for interconnection and network elements on assumptions (or "inputs") inconsistent with the Act's pricing standards. To calculate these rates, the Examiners recommended that the Commission adopt the *Local Competition Order*'s TELRIC methodology, which was not binding on the Commission at that time. Although they disagreed with the rates offered by Bell in its SGAT, the Examiners themselves did not recommend specific rates. Instead,

they urged the Commission to adopt certain cost inputs, from which the parties could generate cost figures using the various cost models advanced by the parties. The Hearing Examiners suggested that the Commission then calculate Act-compliant rates from these cost figures. *See id.* ¶ 261(E)(1)-(14), at 113–14 (J.A. 1422–23).

At an April 22, 1997 public meeting, the Commission adopted some of the Examiners' recommendations (including their recommended cost inputs) while deferring consideration of other issues and any final decision on adoption of the SGAT. *See* Interlocutory Order No. 4488, PSC Doc. No. 96–324 (Apr. 29, 1997) (J.A. 1445–51). The Commission then remanded the SGAT to the Hearing Examiners and ordered them to recommend specific rate levels for interconnection, network elements, and resold services. *See id.* ¶ 2, at 5 (J.A. 1449). The Commission also ordered the Examiners to conduct further investigation into certain objections raised by AT & T, which the Examiners failed to address in their First Report. Those objections concerned (1) the resale charges Bell proposed to assess for access to Bell's Operations Support Systems ("OSS") and (2) network element charges that Bell proposed to assess for certain "non-recurring costs" borne by Bell in processing AT & T's network element orders. *See id.* ¶ 4(a), (g), at 6–7 (J.A. 1450–51). AT & T continues to raise these issues in the present appeal, and more will be said about them later in the court's opinion.

On May 9, 1997, the Hearing Examiners issued a Second Report setting the specific rates called for by the Commission. *See* Findings & Recommendations of the Hearing Examiners on Remand from the Comm'n, PSC Doc. No. 96–324 (May 9, 1997) ("Second Report") (J.A. 1452–84). This Second Report also rejected AT & T's objections to Bell's OSS charges and non-recurring cost assessments but, at a public hearing held on May 13, 1997, the Commission again remanded AT & T's objections for further consideration by the

Hearing Examiners. *See* Interlocutory Order No. 4508, PSC Doc. No. 96324 ¶ 2, at 3–4 (May 27, 1997) (J.A. 1575–76). After additional briefing by the parties, the Hearing Examiners issued a Third Report reaffirming their prior decision to adopt Bell's proposed resale OSS charges and, with minor adjustments, Bell's proposed non-recurring network element charges. *See* Findings & Recommendations of the Hearing Examiners on Further Remand from the Comm'n, PSC Doc. No. 96–324 (May 27, 1997) ("Third Report") (J.A. 1578–93).[4]

At its June 3, 1997 public meeting, the Commission considered the Hearing Examiners' First, Second, and Third Reports as well as submissions by the parties. After deliberations, the Commission issued its SGAT Order. *See* Findings, Opinion & Order No. 4542, PSC Doc. No. 96–324, (Jul. 8, 1997) ("SGAT Order") (J.A. 1594–1660). With respect to the issues currently on appeal, the Commission rejected Bell's SGAT and approved the specific rates recommended by the Hearing Examiners. It also directed Bell to incorporate these rates in a revised SGAT, should Bell choose to file one. *See id.* ¶ MM, at 59 (J.A. 1651). Further, the Commission affirmed the Hearing Examiners' rejection of AT & T's objections to Bell's OSS and non-recurring network element charges. *See id.* ¶ V–51, at 27–31 (J.A. 1619–23).

**B. The Arbitration Proceeding**

During the SGAT Proceeding, AT & T and Bell also were engaged in arbitrated interconnection negotiations that ultimately produced the Interconnection Agreement under review here. A week after Bell filed its proposed SGAT with the Delaware Commission, AT & T filed with the Commission a petition for arbitration of unresolved issues arising out of its interconnection negotiations with Bell. *See* 47 U.S.C. § 252(b)(1) (providing for state

commission arbitration of interconnection agreements). The Commission appointed an Arbitrator to resolve the outstanding issues between Bell and AT & T. The parties quickly realized that some of the disputed issues submitted for arbitration were identical to those simultaneously under review by the Commission in its SGAT Proceeding. Accordingly, the parties withdrew from arbitration their disputes relating to the pricing of interconnection, network elements, and resold services and agreed to have those issues determined in the SGAT Proceeding. *See* Agreement for Withdrawal & Modification of Arbitration Issues, PSC Doc. No. 96–331 (Jan. 17, 1997) (J.A. 349–72). The parties stipulated that the eventual Interconnection Agreement between them would incorporate the Commission's rate determinations in the SGAT Proceeding, regardless of whether the SGAT was ultimately approved or rejected. *See id.*

Several non-price disputes between AT & T and Bell remained subject to arbitration. Of these issues, AT & T raises two here on appeal: (1) the availability of customer specific contracts for resale and (2) the collocation of remote switching modules at Bell's premises. There were no live hearings during the Arbitration Proceeding—the parties conducted limited discovery and then filed comments and replies with the Arbitrator. On April 10, 1997, the Arbitrator issued an Award resolving the outstanding issues between the parties. *See* Arbitration Award, PSC Doc. No. 96–331 (Apr. 10, 1997) (J.A. 1428–44). On May 9, 1997, AT & T filed a motion for reconsideration of the above issues, but the Arbitrator denied the motion. After completion of the SGAT Proceeding, the parties incorporated the results of the Arbitration Award and the Commission's SGAT Order into the Interconnection Agreement.

---

4. The Commission's Interlocutory Order 4508 and the Third Report in response to that Order appear to have been issued on the same

day. There is no explanation for this manifest impossibility.

On September 30, 1997, Bell and AT & T jointly filed the finalized Interconnection Agreement with the Commission. *See* Interconnection Agreement (J.A. 1692–1720). On October 21, 1997, the Commission approved the Interconnection Agreement pursuant to 47 U.S.C. § 252(e)(2). *See* Order No. 4629, PSC Doc. No. 96–331 (Oct. 21, 1997) (J.A. 1741–44). Due to the time constraints imposed by the Telecommunications Act in § 252(e)(4), the Commission indicated that it would enter formal findings and an opinion at a later date. It did so on January 27, 1998. *See* Findings & Opinion for Order No. 4629, & 4709, PSC Doc. No. 96–331 (Jan. 27, 1998) (J.A. 1750–74) ("Interconnection Order"). Bell filed a Complaint in the nature of an appeal ("the SGAT Appeal") on September 8, 1997. AT & T filed its appeal to the Interconnection Order on November 20, 1997 ("the Interconnection Appeal"). The court consolidated both appeals into the instant case.

## IV. STANDARD OF REVIEW

■ The Telecommunications Act is silent as to the scope and standard of review federal district courts must employ in reviewing state commission actions. The Act's provision for federal judicial review states only that federal courts must "determine whether the agreement or statement meets the requirements of section 251 and [252]." 47 U.S.C. § 252(e)(6). In the absence of a more explicit statutory command, the court shall adopt the standards employed in reviews of federal agency actions. In such cases, courts review "the administrative record already in existence, not some new record made initially in the reviewing court." *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (quotations and citation omitted). Accordingly, the court shall conduct a review of the administrative record as it existed before the Commission.

With respect to whether the Commission's actions were procedurally and substantively in compliance with the Telecommunications Act, the court shall adopt a *de novo* standard of review. State agencies have no expertise in interpreting federal law and, thus, are not entitled to the deference accorded a federal agency's interpretation of its own statutes under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See, e.g., Orthopaedic Hosp. v. Belshe,* 103 F.3d 1491, 1495 (9th Cir.1997); *AT & T Communications of Southern States, Inc. v. BellSouth Telecomms., Inc.,* 7 F.Supp.2d 661, 668 (E.D.N.C.1998); *U.S. West Communications, Inc. v. Hix,* 986 F.Supp. 13, 19 (D.Colo.1997). Moreover, deferring to state commission interpretations of the Telecommunications Act would lead to fifty different interpretations of the Act and thereby frustrate Congress' efforts to impose a degree of national uniformity in telecommunications regulation. *See AT & T Communications of S. Cent. States, Inc. v. BellSouth Telecomms., Inc.,* 20 F.Supp.2d 1097, 1100 (E.D.Ky.1998).

The Commission's technical expertise in applying the Act's mandates to the complex facts of the administrative record, however, deserves substantial deference. *See, e.g., BellSouth Telecomms., Inc.,* 7 F.Supp.2d at 668. Accordingly, the court shall adopt the Federal Administrative Procedure Act's "arbitrary and capricious" standard in its review of the Commission's application of the law to the facts. *See* 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court shall review the administrative record "with an eye to whether the [Commission] has 'examine[d] the relevant data and articulate[d] a rational connection between the facts found and the choice made.'" *Time Warner Entertainment Co. v. FCC,* 56 F.3d 151, 163 (D.C.Cir.1995) (citation omitted).

## V. DISCUSSION

Two initial matters require the court's attention before addressing the substance

of the appeals. First, the Commission has moved the court to dismiss the entire action on Eleventh Amendment grounds. The court shall dismiss this motion because the Commission has waived its sovereign immunity and because, even if it did not, the *Ex parte Young* doctrine allows the parties to seek prospective injunctive relief from the Commission's alleged ongoing violations of federal law. Second, the court must determine whether the FCC's *Local Competition Order* affects the court's review of the Commission's decisions. Relevant provisions of the *Local Competition Order* were stayed and later vacated by the Eighth Circuit before the Commission issued the Orders under review. Those provisions since have been reinstated by the Supreme Court. At issue is whether they apply to the Commission's Orders even though they were not in effect when the Commission rendered its decisions.

### A. The Commission's Motion to Dismiss

As an initial matter, the court notes that this is an atypical assertion of sovereign immunity. In essence, this case is an appeal from an administrative agency's decision. Viewed in this light, it is odd indeed for an administrative agency to assert immunity from judicial review of its decisions.[5] As will become evident, the court is skeptical that review of the Commission's voluntary participation in a federal telecommunications regulatory regime presents the kind of affront to state sovereignty that the Eleventh Amendment sought to prevent.

■ The Eleventh Amendment has its genesis in the Supreme Court's decision in *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 1

L.Ed. 440 (1793), which permitted a South Carolina citizen to bring an action for damages against the state of Georgia in federal court. *Chisholm* "created ... a shock of surprise throughout the country," *Hans v. Louisiana*, 134 U.S. 1, 11, 10 S.Ct. 504, 33 L.Ed. 842 (1890), and prompted a speedy passage of the Eleventh Amendment. *See Alden v. Maine*, 527 U.S. 706, ——, 119 S.Ct. 2240, 2250, 144 L.Ed.2d 636 (1999) (describing rapid passage of the Amendment through Congress). The Eleventh Amendment states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Although by its terms the Amendment restricts only the Article III diversity jurisdiction of the federal courts, the Supreme Court has "understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms." *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). That presupposition is that each state is a sovereign entity in our federal system and, consequently, the judicial authority conferred by Article III is limited by this sovereignty. *See id.; see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Consistent with this interpretation of the Amendment, the Supreme Court has held repeatedly that "an unconsenting State is immune from suits brought in federal court by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662

---

**5.** The Telecommunications Act is conspicuously silent on the procedure by which these appeals may be taken. Most aggrieved parties have proceeded as if appealing from a federal agency determination: i.e., by naming the state commission (or its individual commissioners) as defendants. *See* 5 U.S.C. § 703 (1994) (providing that, where a statute

does not provide a special review proceeding, an action for judicial review of an agency proceeding may be brought against the United States, the agency by its official title, or the appropriate officer); Fed. R.App. P. 15(a) (requiring that a federal agency be named as respondent in actions brought to review agency orders).

(1974) (citing *Hans,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842; *Duhne v. New Jersey,* 251 U.S. 311, 40 S.Ct. 154, 64 L.Ed. 280 (1920); *Great Northern Life Ins. Co. v. Read,* 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944); *Parden v. Terminal Ry. of Alabama State Docks Dept.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); *Employees v. Department of Public Health & Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973)). A state's sovereign immunity extends to its agencies, such as the Commission, and state officials, such as the individual Commissioners. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993).

The Court has recognized certain exceptions to state sovereign immunity, the precise contours of which have undergone substantial change in recent years. Over a strenuous dissent authored by Justice Scalia, a plurality of the Court in *Pennsylvania v. Union Gas Co.* held that Congress could abrogate a state's sovereign immunity when acting pursuant to the Commerce Clause. *See* 491 U.S. 1, 15, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) (finding that "Congress has the power to abrogate immunity when exercising its plenary authority to regulate interstate commerce"). Seven years later, in *Seminole Tribe* the Court overruled *Union Gas* and held that Congress may not abrogate a state's sovereign immunity when acting pursuant to its Article I powers. *See Seminole Tribe,* 517 U.S. at 72–73, 116 S.Ct. 1114 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction."). In the wake of *Seminole Tribe,* Congress may abrogate a state's sovereign immunity only when legislating pursuant to the remedial provisions of § 5 of the

Fourteenth Amendment. *See Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Two other exceptions to state sovereign immunity also exist: (1) a state may waive its sovereign immunity by consenting to suit, *see, e.g., Alden,* 527 U.S. at ——, 119 S.Ct. at 2258, and (2) under the so-called *Ex parte Young* doctrine, a private party may sue a state officer for prospective injunctive or declaratory relief from an on-going violation of the Constitution or federal laws. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

The Commission argues that none of these exceptions applies in the present suit. First, it contends that § 252(e)(6) of the Act is an unconstitutional abrogation of Delaware's sovereign immunity. Second, citing the Supreme Court's recent decision in *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) ("*College Savings*"), the Commission asserts that it could not have constructively waived its sovereign immunity by participating in arbitrations and reviews of interconnection agreements under the Act. Third, the Commission argues that the present suit may not proceed under the *Ex parte Young* exception.

### 1. Abrogation

■ Relying on *Seminole Tribe,* the Commission asks the court to declare the Act's provision for judicial review, § 252(e)(6), an unconstitutional abrogation of state sovereign immunity.[6] *See* D.I. 128 at 7–9. Although § 252(e)(6) of the Act provides for federal review of state commission determinations under certain circumstances,[7] it is hardly equivalent to the "abrogation" found unconstitutional in *Seminole Tribe.* In that case, the Su-

---

6. Neither Bell nor AT & T address this argument.

7. Section 252(e)(6) provides that
[i]n any case in which a State commission makes a determination under this section,

any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of Section 251 and this section [252].

preme Court reviewed the constitutionality of the Indian Gaming Regulatory Act ("IGRA"), which Congress passed pursuant to its Article I power to regulate commerce with the Indian tribes. *See* U.S. Const., art. I, § 8, cl. 3. The IGRA imposed upon the states a duty to negotiate in "good faith" with an Indian tribe toward the establishment of a Tribal–State compact governing gaming activities on Indian reservations.[8] The IGRA also authorized a tribe to bring suit in federal court against a state in order to compel the state to negotiate in good faith.[9] The petitioner brought suit against the State of Florida under the IGRA, and Florida asserted its immunity from suit. In the Supreme Court, the petitioner argued that the Eleventh Amendment did not prohibit its suit because Congress, through the IGRA, had abrogated state sovereign immunity.

The Supreme Court analyzed the IGRA under the two-part test for determining whether a federal statute validly abrogates state sovereign immunity. The first part of that test, which the Commission does not address, asks whether Congress has " 'unequivocally expresse[d] its intent to abrogate the immunity.' " *Seminole Tribe,* 517 U.S. at 55, 116 S.Ct. 1114 (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)). Congress must express this intent in "a clear legislative statement." *Blatchford,* 501 U.S. at 786, 111 S.Ct. 2578. The Court in *Seminole Tribe* found that the IGRA clearly expressed an intent to abrogate state sovereign immunity by vesting jurisdiction in " '[t]he United States district courts ... over any cause of action ... arising from the failure of a State to enter into negotiations ... or to conduct such negotiations in good faith.' " *Seminole Tribe,* 517 U.S. at

56–57, 116 S.Ct. 1114 (quoting § 2710(d)(7)(A)(i)). Only after concluding that Congress had unequivocally stated its intent to abrogate state sovereign immunity did the Court address the second prong of the test, which asks whether Congress had the constitutional authority to abrogate state immunity.

The Commission, however, begins with the second prong of the abrogation test and does not address whether Congress clearly stated its intent to abrogate state sovereign immunity. The intent to abrogate is by no means clear from the face of the Telecommunications Act. *See, e.g., MCI Telecomms. Corp. v. Illinois Commerce Comm'n,* 183 F.3d 558, 566 (7th Cir.) (noting that the Act offers states "a genuine choice" to participate in the federal regulatory function delegated to them or to retain their sovereign immunity and allow the FCC to conduct the federal regulatory functions without state participation), *rh'g granted,* 183 F.3d 567 (7th Cir.1999). Unlike the IGRA, the Telecommunications Act permits state commissions to absent themselves entirely from participation under the Act and, consequently, from federal court review of their actions:

> (5) Commission to act if State will not act. If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the [FCC] shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission.

8. *See, e.g.,* 25 U.S.C. § 2710(d)(3) ("Upon receiving [a request for negotiations], the State shall negotiate with the Indian tribe in good faith ...."); § 2710(d)(7)(A)(i) (giving United States district courts jurisdiction over "any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe").

9. *See Seminole Tribe,* 517 U.S. at 50, 116 S.Ct. 1114 ("If the district court concludes that the State has failed to negotiate in good faith toward the formation of a Tribal–State compact, then it 'shall order the State and Indian Tribe to conclude such a compact within a 60–day period.' ") (quoting IGRA, 25 U.S.C. § 27(d)(17)(B)(iii)).

(6) Review of State commission Actions. In a case in which a State fails to act as described in paragraph (5), the proceeding by the [FCC] under such paragraph and any judicial review of the FCC's actions shall be the exclusive remedies for a State commission's failure to act. . . .

*Id.* § 252(e)(5)-(6). The FCC's implementing regulations construe a "failure to act" as a state commission's failure to respond to a request for mediation or arbitration within a reasonable time or a failure to complete an arbitration within the statutory time limits. *See* 47 C.F.R. § 51.801 (1998). Thus, a state may avoid answering suit in federal court simply by declining a request to arbitrate an interconnection agreement or by not acting to approve or reject an interconnection agreement within 90 days of its submission by the parties. *See id.* § 252(e)(4) (deeming an interconnection agreement "approved" if the state commission does not act within 90 days of its submission).

It is only where, as here, a state commission voluntarily participates in the federal regulatory scheme that its actions become subject to federal review:

In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the· agreement or statement meets the requirements of section 251 and [252].

*Id.* § 252(e)(6). Legislation that enables a state to avoid federal jurisdiction entirely can hardly qualify as an unequivocal expression of Congress's intent to abrogate state sovereign immunity. Congress did not offer a similar choice to the states in the IGRA, and it is this choice that distinguishes the IGRA from the Telecommunications Act.

Because the Telecommunications Act premises federal review of state commission actions on a commission's wholly voluntary participation under the Act, the

court declines to find that § 252(e)(6) abrogates state sovereign immunity and, therefore, it need not reach the question of whether § 252(e)(6) is unconstitutional. The question is, then, whether some other exception to sovereign immunity permits the court to entertain this suit against the Commission and the Commissioners.

## 2. Waiver

■ Generally, states waive their sovereign immunity when they voluntarily invoke federal jurisdiction, *see Gunter v. Atlantic Coast Line R.R. Co.,* 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477 (1906), or when the state makes a "clear declaration" of its intent to submit to federal jurisdiction. *See, e.g., Read,* 322 U.S. at 54, 64 S.Ct. 873. This intent to submit to federal jurisdiction must be "unequivocal," *see Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), and may occur by state statute or constitutional provision or by otherwise clearly waiving immunity from suit **in the context of a particular federal program.** *See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (emphasis added). "[A] waiver may be found not only in the text of a state statute or constitution but also by examining the **underlying facts and circumstances of the case.**" *Innes v. Kansas State Univ. (In re Innes ),* 184 F.3d 1275, 1280 (10th Cir.1999) (emphasis added); *accord Georgia Dep't of Revenue v. Burke (In re Burke ),* 146 F.3d 1313, 1318 (11th Cir.1998) (concluding that, "in the absence of explicit consent by state statute or constitutional provision, a state may consent to a federal court's jurisdiction through its **affirmative conduct**") (emphasis added), *cert. denied,* —— U.S. ——, 119 S.Ct. 2410, 144 L.Ed.2d 808 (1999). At issue is whether the "underlying circumstances" of this case support a finding that, through its "affirmative conduct," Delaware has waived its immunity in the context of the federal regulatory

scheme embodied in the Telecommunications Act.

Significantly, Delaware enacted a law authorizing the Commission to act "in accord with the applicable provisions of the Telecommunications Act of 1996." *See* 70 Del. Laws, c. 556 (1996) (codified at 26 Del. C. § 703(4) (Supp.1998)).[10] Acting pursuant to this enabling legislation, the Commission arbitrated the Interconnection Agreement and approved the SGAT knowing full well that the Telecommunications Act provided for federal court review of its actions. Nonetheless, the Commission now argues that, in light of the Supreme Court's decision in *College Savings*, its actions did not constitute a waiver of its sovereign immunity. The Commission, however, reads *College Savings* too broadly.

In *College Savings*, the Supreme Court specifically addressed the question of whether Florida "constructively" waived its sovereign immunity by marketing a college tuition savings plan in interstate commerce. College Savings Bank sued Florida under the Lanham Act as amended by the Trademark Remedy Clarification Act ("TRCA"), which subjected the states to suit under the Lanham Act for false and misleading advertising in interstate commerce.[11] *See id.* at 2222. Relying on the Court's first enunciation of the doctrine of constructive waiver in *Parden v. Terminal Railway*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), College Savings Bank argued that Florida had constructively waived its sovereign immunity by marketing a college savings plan in interstate commerce. The Court rejected this argument and overruled *Parden*, explaining that "there is little reason to assume actual consent based upon the State's mere presence in a field subject to congressional regulation." *Id.* at 2228. The Court reasoned that a waiver of sovereign immunity must be voluntary, and the voluntariness of a waiver is destroyed when "what is attached to the refusal to waive is the exclusion of the State from otherwise lawful activity." *Id.* at 2231.

The state activity at issue in *College Savings* bears little resemblance to that undertaken by the Commission in the present case. Unlike Florida, Delaware is not merely participating in otherwise lawful activities subject to federal regulation. Instead, the Delaware Commission (with the Delaware legislature's blessing) is actively regulating pursuant to a federal regulatory scheme. By contrast, Florida assumed no federal regulatory burdens by entering the market for college savings plans. What is more, the TRCA did not propose a federal-state regulatory partnership, nor did it explicitly condition Florida's marketing efforts on consent to feder-

---

10. AT & T argues that this law is an explicit waiver of the state's sovereign immunity. The most obvious way a state can waive its immunity is by statute, *see Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 306–08, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990), but the "overwhelming implication" of this enabling legislation does not indicate an intent to subject the state to federal jurisdiction. *See Edelman*, 415 U.S. at 673, 94 S.Ct. 1347. Read as a whole, the law is designed only to allow the Commission to disregard certain time limits imposed by the state Administrative Procedure Act—time limits that conflict with timetables imposed by the Telecommunications Act. *See* Act of July 1996, 70 Del. Laws, c. 556 (1996) (codified at 26 Del. C. § 703(4) (Supp.1998) (titled, "An Act to Amend Title 26 of the Delaware Code to Grant to the Public Service Commission Jurisdiction and Authority to Conduct Proceed-

ings as Prescribed by the Federal Telecommunications Act of 1996 Without Strict Adherence to the Procedural Requirements Set Forth in the Public Utilities Act and the State Administrative Procedures Act")). The Delaware law is, however, evidence that the Commission had the authority to bind the state to the Act's conditions.

11. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides a private right of action against "[a]ny person" who uses false descriptions or makes false representations in commerce. The TRCA amends § 43(a) by defining "any person" to include "any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity." § 3(c), 106 Stat. 3568.

al jurisdiction. Florida simply assumed the role of a private bank and marketed a college savings plan similar in many respects to plans offered by other private banks. The Supreme Court rejected the notion that a waiver of sovereign immunity could be presumed from Florida's choice to engage in this type of "otherwise lawful" activity.

In the present case, the Commission's actions more closely resemble those recognized by the Court in *College Savings* as constituting a valid waiver of sovereign immunity. The Supreme Court explained in *College Savings* that Congress may condition a waiver of state sovereign immunity upon the state's acceptance of federal "gratuities." *See id.* at 2231. The Court offered two examples. In *Petty v. Tennessee–Missouri Bridge Commission*, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959), the Court held that a bistate commission (which the Court assumed enjoyed state sovereign immunity) created pursuant to an interstate compact had consented to suit by reason of a suability provision attached to congressional approval of the compact. The Court explained in *College Savings* that, because the Compact Clause prohibits such interstate compacts without congressional approval, the granting of such approval was a gratuity and Congress could condition a waiver of sovereign immunity upon acceptance of the gratuity. *See College Savings*, 119 S.Ct. at 2231.

Here, Congress conditioned the states' regulation of interconnection agreements and SGATs upon state consent to federal court review of state commission actions. *See U.S. West Communications, Inc. v. Mecham*, No. 2:98CV–490K, slip op. at 6 (D.Utah Aug. 13, 1999) (noting that subsections 252(e)(4)-(6) "evince a clear [c]ongressional intention to condition regulation by a state commission upon review of that commission's actions in federal court"). Congress is not obligated to allow continued state participation in such regulation. *See FERC v. Mississippi*, 456 U.S. 742, 764, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) (explaining that "the commerce power permits Congress to preempt the States entirely in the regulation of private utilities"); *AT & T Communications of the Southwest, Inc. v. Southwestern Bell Tel. Co.*, 97–1573–CV–W–5, slip op. at 19 (W.D.Mo. Aug. 31, 1999) (noting that, "[a]bsent [c]ongressional authority, the [state utility commission] would have no right to participate in the unique dispute resolution process devised by Congress"). As such, state participation in federal telecommunications regulation under the Act is a gratuity upon which Congress may condition a waiver of state sovereign immunity.[12] Because the state of Delaware has accepted this gratuity, its waiver of sovereign immunity may be presumed.

### 3. *Ex parte Young*

■ Even if Delaware's voluntary acceptance of this congressional gratuity did not constitute an effective waiver of its sovereign immunity, the present suit still could proceed under the *Ex parte Young*

12. The Commission and three district courts argue that continued state regulation of local telephony is not a gratuity because such regulation is a "core state function" and, as such, the states cannot freely decline to participate under the Act. *See Bell Atlantic–Maryland, Inc. v. MFS Intelenet*, C. No. S99–2061, slip op. at 8 (D.Md. Oct. 20, 1999); *Wisconsin Bell, Inc. v. Public Serv. Comm'n of Wis.*, 57 F.Supp.2d 710, 712 (W.D.Wis.1999); *AT & T Communications of S. Cent. States, Inc. v. BellSouth Telecomms., Inc.*, 43 F.Supp.2d 593, 602 (M.D.La.1999). This critique has more rhetorical than substantive force and is, in the end, irrelevant. Congress' power to federalize telecommunications regulation is as unquestioned as its power to federalize crimes affecting interstate commerce. *See FERC v. Mississippi*, 456 U.S. 742, 764, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). Although the wisdom of federal preemption of these areas is debatable, the power of Congress to do so is virtually undisputed. Because Congress has this undisputed power to preempt state regulation of telecommunications, continued state regulation of this area following the enactment of the Telecommunications Act is (in the constitutional sense) a gratuity upon which Congress may condition federal court review of state commission actions.

doctrine. In *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court held that, notwithstanding the Eleventh Amendment, federal courts have the jurisdiction to entertain a suit against a state officer to enjoin official actions violating federal law (statutory or constitutional), even though the state itself may be immune. Under the *Young* doctrine, "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan*, 440 U.S. 332, 337, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). The *Young* doctrine enables "federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Halderman*, 465 U.S. at 105, 104 S.Ct. 900 (quoting *Ex parte Young*, 209 U.S. at 160, 28 S.Ct. 441). The Commission contends, however, that the Supreme Court's decision in *Seminole Tribe* foreclosed *Ex parte Young* relief in cases where Congress provided a limited statutory remedial scheme. The Commission asserts that § 252(e)(6) of the Telecommunications Act provides a limited remedy and, therefore, that the court has no jurisdiction over the individual Commissioners.

In *Seminole Tribe*, the Supreme Court addressed whether the *Young* doctrine permitted the tribe to seek prospective injunctive relief against Florida's governor to enforce the good faith bargaining provisions of the IGRA. The IGRA purported to make the state's statutory obligation to negotiate in good faith judicially enforceable in federal court. *See* 25 U.S.C. § 2710(d)(7)(A)(i), (B)(i). To that end, the IGRA permitted tribes to seek an order in federal court directing a state to conclude a compact within a sixty day period. *See id.* § 2710(d)(7)(B)(iii). If the state failed to comply with the court's order, the IGRA delineated a complex, post-judgment remedial scheme that included mediation, *see id.* § 2710(d)(7)(B)(iv)-(vi) and, failing state consent to a compact, ultimately culminated in the issuance of gaming regulations by the Secretary of the Interior. *See id.* § 2710(d)(7)(B)(vii). In light of this "carefully crafted and intricate" **post-judgment** remedial scheme, *see Seminole Tribe*, 517 U.S. at 73-74, 116 S.Ct. 1114, the Court held that "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based on *Ex parte Young*." *Id.* at 74, 116 S.Ct. 1114.

Unlike the remedial scheme of the IGRA, § 252(e)(6) of the Telecommunications Act provides the sole remedy for parties aggrieved by a state commission determination. Such parties may bring an action in federal district court "to determine whether the agreement or statement meets the requirements of section 251 [and 252]." 47 U.S.C. § 252(e)(6). There is no further administrative remedy provided after judicial review. Indeed, the Act is silent as to how federal district courts should enforce their rulings, thus implying that they enjoy the full panoply of remedies allowable in a *Young* suit for prospective relief of on-going violations of federal law. Indeed, the Telecommunications Act expressly states that it "shall not be construed to modify, impair or supersede Federal ... law unless expressly so provided in such Act or amendments." 110 Stat. 143(c). As such, the court's declaratory and injunctive powers under 28 U.S.C. §§ 1651 and 2201 are fully intact, and this is in keeping with the principle that where Congress establishes a cause of action, courts "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Franklin v. Gwinnett County Pub. Schools*, 503 U.S. 60, 66, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Thus, *Seminole Tribe*'s limitation of *Young* does not affect the court's ability to entertain the present suit against the individual Commissioners. The court, therefore, shall deny the Commission's motion to dismiss.

## B. The Applicability of the FCC Pricing Rules

■ The court now turns to the question of whether the FCC pricing rules apply to the present review of the Commission's Orders. First, though, a history of the FCC's regulations is necessary. Section 251(d) of the Telecommunications Act requires the FCC to promulgate regulations implementing the Act's rather broad interconnection mandates. *See* 47 U.S.C. § 251(d). Soon after the Act's passage, the FCC issued its voluminous *Local Competition Order,* in which the FCC adopted the TELRIC methodology for determining the "just and reasonable" rates called for by the Act. *See* 47 U.S.C. § 252(d). These regulations were to take effect on September 30, 1996, *see* 61 Fed. Reg. 45,476 (1996), but on September 27, 1996 the Eighth Circuit temporarily stayed their effective date. *See Iowa Utils. Bd. v. FCC,* 96 F.3d 1116, 1118 (8th Cir.1996). Although the Eighth Circuit eventually lifted its stay with respect to some of these regulations, it continued to stay the *Local Competition Order*'s pricing regulations, which are relevant to the appeals at bar. On July 18, 1997, the Eighth Circuit vacated many of the stayed FCC regulations (including the TELRIC pricing rules) on the ground that the FCC lacked the jurisdiction to issue them. *See Iowa Utils. Bd. v. F.C.C.,* 120 F.3d 753, 796 & n. 15 (8th Cir.1997).

During the *Local Competition Order*'s pilgrimage through judicial limbo, the Commission rejected Bell's proposed SGAT and approved the parties' Interconnection Agreement. *See* Final Order, PSC Doc. No. 96–324 (July 8, 1997) (J.A. 1594); Order No. 4629, PSC Doc. No. 96–331 (Oct. 21, 1997) (J.A. 1741). Significantly, in its SGAT Order the Commission voluntarily adopted the *Local Competition Order*'s TELRIC methodology even though that portion of the *Local Competition Order* had never gone into effect. The Commission noted that TELRIC was "appropriate as the standard for determining just and reasonable rates under § 252(d)(1) for unbundled network elements and interconnection in Delaware ... regardless of whether the FCC acted within its powers in imposing this standard on the states." SGAT Order ¶ 23, at 13; *see also id.* ¶ B, at 50.

On January 25, 1999 the Supreme Court reversed the Eighth Circuit in part, concluding that the FCC did have the jurisdiction to promulgate the *Local Competition Order. See AT & T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). Since this remand, the Eighth Circuit has vacated its previous order, thus reinstating the FCC pricing rules. *See* D.I. 125. The court ordered supplemental briefing on the impact of the Supreme Court's decision in the present case. *See* D.I. 109. Both AT & T and the Commission argue that TELRIC governs the court's disposition of the appeals. Conversely, Bell contends that TELRIC does not apply retroactively because it was not in effect when the Commission issued its Orders. Bell urges the court to test the legality of the Commission's Orders solely by reference to the broad statutory pricing standards.

The procedural posture of this case poses a perplexing dilemma for a reviewing court. On the one hand, the FCC regulations were not in effect when the Commission rejected Bell's SGAT and "'the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place.'" *Landgraf v. USI Film Prods.,* 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 855, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring)). The conduct under review is the Commission's rejection of Bell's SGAT, and that conduct occurred before the FCC's *Local Competition Order* took effect. At least two district courts have concluded that the Eighth Circuit's stay and vacatur bars retroactive application of the *Local Competition Order. See U.S. West Communica-*

*tions, Inc. v. Jennings,* 46 F.Supp.2d 1004 (D.Ariz.1999); *MCI Telecomms. Corp. v. GTE Northwest, Inc.,* 41 F.Supp.2d 1157 (D.Or.1999).

Unlike the state commissions in *Jennings* and *GTE Northwest, Inc.,* however, the Delaware Commission (with the parties' consent) voluntarily adopted the FCC's TELRIC pricing methodology. *See* Final Order, ¶ 23, at 13; ¶ B, at 50 (J.A. 1594, 1605, 1644). At the time, none of the parties raised any objections to the Commission's choice. *See, e.g., id.* ¶ 24, at 13 (J.A. 1605); *In re Petition of Bell Atlantic–Delaware for Approval of its SGAT under § 252(f) of the Telecommunications Act of 1996,* at 2 n. 2 (J.A. 74). Although the Commission was under no legal obligation to adopt TELRIC, it did so and TELRIC is now binding federal law by virtue of the Supreme Court's decision in *Iowa Utilities.* The court, therefore, will hold the Commission and the parties to their choice and will assess the Commission's actions in light of the *Local Competition Order.* The court also notes that Bell will suffer no harm from retroactively applying TELRIC because it had ample notice that the Commission would apply the *Local Competition Order*'s mandates. *See GTE South, Inc. v. Morrison,* 199 F.3d 733, 741-742 (4th Cir.1999) (applying *Local Competition Order* retroactively).

## VI. THE APPEALS

### A. The SGAT Appeal

According to Bell, the Commission's SGAT Order violated the Act in four respects.[13] The first three of its objections relate to alleged errors in the setting of network element prices by the Commission. First, Bell argues that the Order set rates for competitors to use Bell's switching facilities premised on the assumption (which Bell argues is fictional) that Bell will receive bulk discounts by completely replacing its existing central office switching equipment with new switches. Bell claims that this violates the Act's requirement that ILECs recover their "cost … of providing" facilities to competitors. *See* 47 U.S.C. § 252(d)(1)(A)(i). Second, Bell claims that the Commission based its cost of capital on "a decade-old rate-of-return proceeding." D.I. 83 at 1. If true, this would violate the Act's mandate that costs be "determined without reference to a rate-of-return or other rate-based proceeding." 47 U.S.C. § 252(d)(1)(A)(i). Third, the Commission allegedly based the rates at which Bell must provide parts of its network to competitors on a "backward looking depreciation rate". developed several years ago by the FCC. Bell argues that this prevents it from recovering its costs because the rate does not reflect the "much shorter economic life of assets … in today's competitive market."D.I. 83 at 2.

Bell's fourth assertion of error relates to the Commission's determination of a wholesale discount rate. Bell alleges that the Commission based the wholesale rates that competitors must pay Bell for its services on "cost savings that theoretically could be realized by a **hypothetical** carrier providing **only** wholesale service, rather than on cost savings that will be realized by Bell, which provides both retail **and** wholesale services." D.I. 83 at 2. The court shall address each of these arguments in turn.

### 1. Network Element Rates

### a. Switch Discounts

■ "Switches" are computer-like processors that route telephone calls to their destinations, and they fall under the definition of "network elements" in the Telecom-

13. In its opening brief, Bell also argues in support of its counterclaim/crossclaim against AT & T and the Commission that the Commission erred by holding that certain directory publishing services are "network elements" that Bell must make available to AT & T at cost-based rates. *See* D.I. 83 at 27–29. Because this argument arises out of the Interconnection Agreement, the court shall address Bell's counterclaim/crossclaim in its discussion of the Interconnection Appeal.

munications Act. As such, ILECs must make switches available to competitors on an unbundled basis at rates "based on the cost ... of providing the ... network element." 47 U.S.C. § 252(d)(1); *see also Local Competition Order* ¶ 410, at 203. In its SGAT Order, the Commission set the rate that Bell could charge for unbundled switching based on the assumption that Bell would replace its switches in the long-run and receive large discounts offered by switch sellers for bulk purchases. *See* SGAT Order ¶ 33 (J.A. 1611–12). Bell contends that its newly purchased switches are state-of-the-art and that any additions to its switching system will come only in the form of "add-on" line cards,[14] for which it will receive much smaller discounts. Thus, Bell argues, the Commission's Order forces Bell to pass along to competitors "massive" switch discounts that it will never receive. If true, this would violate the Act's requirement that the rates charged for unbundled network elements reflect "the cost of providing" the network element. *See* 47 U.S.C. § 252(d)(1)(A)(i).

To calculate the "cost of providing" switches, the Commission adopted the FCC's TELRIC pricing methodology, which requires the Commission to set "forward-looking" or "long run" prices. *See Local Competition Order* ¶¶ 683–685, at 346. Bell does not dispute that TELRIC's forward-looking pricing methodology provides the appropriate legal standard for resolving the switch discount issue. Instead, it challenges the Commission's understanding of "long-run" switching costs and argues that the Commission ignored the *Local Competition Order*'s requirement that TELRIC capture "the incremental costs that incumbents actually expect to incur in making new network elements available to new entrants." Local

Competition Order ¶ 685, at 346. At issue, then, is whether the Commission acted reasonably by including bulk discounts as part of the forward-looking, long-run price that Bell may charge for use of its switching equipment. The court shall review this issue under an arbitrary and capricious standard.

To understand the TELRIC or "Total Element Long Run Incremental Cost," pricing methodology, one must first grasp some basic definitions subsumed in the acronym itself. From an economic standpoint, "long-run" refers to " 'a period so long that all of the firm's present contracts will have run out, its present plant and equipment will have been worn out or rendered obsolete and will therefore need replacement.' " *Local Competition Order* ¶ 677, at 343 n. 1682 (quoting William Baumol, *Economic Theory and Operations Analysis* 290 (4th ed. 1977)). "Incremental" costs are those additional costs that a firm incurs when expanding the output of a good or service by producing an additional quantity of the good or service. *See id.* ¶ 675, at 342. Incremental costs are forward-looking because firms will incur these costs as the output level changes by a given increment. *Id.* Conversely, historic or "embedded" costs represent past investments and costs that a firm already has incurred.[15]

In a competitive market, the actual price of a good or service will tend toward its long-run, incremental cost. *Id.* Thus, costs calculated according to the TELRIC methodology mimic those costs that an efficient company, constrained by competitive market forces, would incur in providing the requested network element. *See MCI Telecomms. Corp. v. Pacific Bell*, No. C 97–0670 SI, slip op. at 6 (N.D.Cal. Sept.

---

14. A line card is a "plug-in" electronic circuit card that upgrades the capacity of existing switches and that operates ringing, holding, and other features associated with telephone service. *See Local Competition Order* ¶ 412, at 204 n. 913.

15. The best example of an embedded cost pricing approach is the rate of return proceeding traditionally used by state utility commissions. Such proceedings set rates to recover a rate-of-return over and above a utility's "rate base," which consists of embedded investments in plant and equipment.

29, 1998). Consequently, TELRIC provides the best estimate of what it would cost an efficient competitor to enter, and compete in, the local telephone market. *See Southwestern Bell,* slip op. at 24. Because it seeks to mimic costs in a competitive market, TELRIC does not permit consideration of embedded costs. Calculating prices based on such costs would permit ILECs to pass on to competitors inflated, monopoly-era costs that have little relation to costs in a competitive environment.[16] *See Southwestern Bell,* slip op. at 24; *Local Competition Order* ¶ 705, at 355–56 (characterizing an embedded cost methodology as pro-competitor, not pro-competition).

Where, as here, the market is presently a monopoly, the Hearing Examiners and the Commission (which adopted the Hearing Examiners' findings) estimated the efficient forward-looking, long-run costs of a local exchange provider based on the FCC's particular formulation of TELRIC. According to the regulations implementing the FCC's *Local Competition Order,* TELRIC's forward-looking pricing methodology for interconnection and unbundled network elements "should be measured based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the [ILEC's] wire centers." 47 C.F.R. § 51.505(b)(1); *see also Local Competition Order* ¶ 685, at 346. The Hearing Examiners concluded that an efficient telecommunications provider would replace its obsolete switches (and receive bulk discounts) rather than adding, in piece-meal fashion, line cards for which it would receive much smaller discounts. *See* First Report ¶ 135, at 63 (J.A. 1372). Bell argues that its switches are brand new and that it will not need to replace them with new switches (and receive the attendant discounts) "in the coming years." *See* D.I. 83 at 14. Thus, Bell concludes, the inclusion of bulk rate switching discounts in its costs will make it impossible for it to recover the incremental costs it "actually expects" to incur.

As the Hearing Examiners noted, however, the current state of Bell's network is irrelevant for purposes of a long-run cost analysis. The state of Bell's network "in the coming years" is equally irrelevant. The proper time-frame is, as the Hearing Examiners rightly noted, the "long-run." *See Local Competition Order* ¶ 677, at 343 n. 1682. In the long-run, a firm's present equipment will become obsolete and need replacement. *See id.* It is to this long-run period of obsolescence that a forward-looking pricing methodology looks.

Indeed, Bell's own expert witness admitted in testimony before the Hearing Examiners that the *Local Competition Order* "says rip every switch out. All of them. . . . Every switch in the network, rip them out. Leave the . . . wire center location where they [sic] are. And build the network that you would build today to serve the demand." First SGAT Report, ¶ 31, at 16 (J.A. 1325) (quoting testimony of William E. Taylor).[17] In the long-run (a period of time that varies according to the technology at issue), an efficient and ra-

---

**16.** The Seventh Circuit has explained why this is so:

> The business manager makes a decision to enter a new market by comparing anticipated additional revenues (at a particular price) with anticipated additional costs. If the expected revenues cover all the costs caused by the new product, then a rational business manager has sound business reasons to enter the new market. The historical costs associated with the plant already in place are essentially irrelevant to this decision since those costs are "sunk" and unavoidable and are unaffected by the new production decision.

> *MCI Communications Corp. v. AT & T Co.,* 708 F.2d 1081, 1117 (7th Cir.1983).

**17.** Dr. Taylor also characterized "reconstructed local network" as it appears in ¶ 685 of the *Local Competition Order* as follows:

> I take that to mean that all elements of the local network, including the switches, including the building that surrounds the switch . . . all of those elements get rebuilt as if the neutron bomb flattened them.

> (J.A. 927)..

tional competitor would replace all of its existing switches with the most current technology and receive the bulk-rate discounts. Viewed in this light, Bell's proposed switch costs, which it premised upon the smaller add-on discounts for which it will qualify "in the coming years," looks only to the short-run. The Hearing Examiners correctly concluded that Bell's cost analysis was "deficient in that it does not reflect a long-run approach, but rather a series of short-run cost estimates." First Report ¶ 33, at 18 (J.A. 1327). Therefore, the court shall affirm the Commission's SGAT Order as it relates to switch discounts.

#### b. Cost of Capital

■ Bell argues that the Commission erred in setting Bell's cost of capital. The cost of capital reflects the return that Bell must offer investors to attract debt and equity financing. *See Local Competition Order* ¶ 700, at 352. High-risk businesses typically face higher costs of capital because these businesses must pay investors more for the use of their money. The cost of capital is calculated from three variables: (1) the cost of equity; (2) the cost of debt; and (3) the ratio of equity to debt. *See* D.I. 86 at 30. For the past several years, the Commission permitted Bell to recover a cost of capital of 11.9%. *See* D.I. 83 at 17. In its proposed SGAT, Bell suggested that it be allowed a cost of capital of 13.2% to recover what it characterized as greater business risks due to increased competition in the local telephone market. The Commission rejected Bell's proposal and permitted Bell to recover a cost of capital of 10.28% based on a cost of debt of 7.7%, a cost of equity of 12%, and a ratio of 60% equity to 40% debt. *See* SGAT Order ¶¶ 28–29, at 16–17 (J.A. 1608–09).

Bell specifically challenges the reasonableness of the cost of equity adopted by the Commission. Bell argues that the Hearing Examiners and the Commission [18] relied on a rate of return stipulation that Bell had entered into in 1992 that was based on a rate case proceeding that concluded in 1988. *See* D.I. 83 at 17–18. Bell considers this a violation of § 252(d)(1) of the Telecommunications Act, which instructs regulators to determine network element charges "without reference to a rate-of-return or other rate-based proceeding." 47 U.S.C. § 252(d)(1)(A)(i). Bell also argues that the Commission erred by ignoring substantial evidence that Bell's cost of capital had increased due to intensified competition. The standard of review is whether the Commission's decision was arbitrary and capricious.

Determination of the cost of capital falls under the pricing standards outlined in § 252(d) of the Telecommunications Act. Those standards require state commissions to determine a "just and reasonable" rate for the sale of network elements "based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the ... network element." 47 U.S.C. § 252(d)(1)(A)(i). Although state commissions may not determine cost of capital by conducting a "rate of return or other rate based proceeding," the FCC explained in its *Local Competition Order* that "the currently authorized rate of return at the federal or state level is a reasonable starting point for TELRIC calculations." *Local Competition Order* ¶ 702, at 353 (emphasis added). ILECs, like Bell, bear the burden of "demonstrating with specificity that the business risks that they face in providing unbundled network elements ... would justify a different risk-adjusted cost of capital." *Id.*

It is apparent from their First Report that the Hearing Examiners did not determine Bell's cost of equity with reference to a prior rate of return proceeding. In their

---

**18.** In setting the cost of capital, the Commission adopted both the conclusion and the reasoning of the Hearing Examiners' First Report. *See* SGAT Order ¶ 28, at 16 (J.A. 1608). Consequently, the court shall refer only to the Hearing Examiners' First Report.

First Report to the Commission, the Hearing Examiners noted only that their proposed cost of equity was "consistent with the cost to which [Bell] and the [Office of Public Advocate] stipulated in Docket 92–47 and which was approved by the Commission by Order No. 3725 dated December 7, 1993." First Report ¶ 61, at 33 (J.A. 1342). As the FCC's *Local Competition Order* noted, the Hearing Examiners were entitled to refer to this stipulated rate as a starting point in their calculation of cost of capital. *See Local Competition Order* ¶ 702, at 353. The Hearing Examiners merely noted the prior stipulated rate as a baseline for the real focus of their inquiry: whether Bell had demonstrated with specificity that its business risks in providing unbundled network elements justified a different rate. This is a far cry from **determining** the cost of capital with reference to a rate of return proceeding. Nothing in the Act or the *Local Competition Order* prohibits a state commission from acknowledging that a costing variable has remained unchanged since the last rate making proceeding. Accordingly, the Hearing Examiners did not abuse their discretion in referring to the prior stipulated cost of equity. The court now must determine whether the Hearing Examiners abused their discretion in rejecting Bell's proposed cost of capital.

In assessing Bell's case for an elevated cost of equity, the Hearing Examiners criticized the testimony of Bell's expert, Dr. James Vander Weide. The Examiners noted that Vander Weide based his cost of equity on the risk associated with Bell's retail business instead of on the future demand for Bell's network elements that it will sell at **wholesale**. AT & T's expert, Bradford Cornell, also criticized Vander Weide's analysis as "ignor[ing] the critical fact that the business at hand in this proceeding is **not** local retail phone service that already exists, but rather the new business of leasing of network elements at **wholesale** for use in providing competitive phone service to an existing **retail** market." Cornell Test. at 36–37 (J.A. 413–14). The distinction between wholesale and retail is crucial.

Retail competition is competition for the end user of telephone service. That sort of competition is not at issue when determining the risks associated with leasing unbundled network elements (e.g., loops and switches) at wholesale. The risks associated with leasing "bottleneck" network elements at wholesale is less than that associated with competition for retail service. *See Local Competition Order* ¶ 702, at 353 (noting that network elements "generally are bottleneck, monopoly services that do not now face significant competition"). This is so because Bell often is the only provider of these network elements, and it is to Bell that new entrants must come to lease or purchase loops, switches, and other network elements. Thus, even if retail competition intensifies, Bell's prominence as a wholesale provider of network elements will remain largely unaffected—at least until new entrants build their own networks.[19] Accordingly, the Hearing Examiners correctly rejected Vander Weide's testimony as impermissibly attributing the risks of retail competition to the competition in the sale of un-

19. Bell points to an apparent contradiction in assuming instantly competitive prices for network elements (even though no such competition now exists) but, in the context of determining cost of capital, assuming little competition and, consequently, low costs of capital. *See* D.I. 85 at 7–8. The Telecommunications Act attempts to recreate the prices that a hypothetical efficient company would charge for its network elements and services in a competitive market. Indulging in this fiction, however, does not change the fact that ILECS like Bell do not face the same competitive risks as firms operating in a competitive market. Indeed, ILECs have had no competition for decades, and they will face little competition in the market for network elements in the near future. *See Local Competition Order* ¶ 702, at 353. Therefore, in introducing competition in the local telephone market, it makes perfect sense to recreate competitive prices while acknowledging that the current lack of competition warrants reduced costs of capital.

bundled network elements. *See Local Competition Order* ¶ 691, at 348 (explaining that, "[o]nly those costs that are incurred in the provision of network elements in the long run shall be directly attributable to those elements").

The Examiners also discounted Vander Weide's analysis because he based his cost of equity calculation on the assumption that Bell's business was as risky as that of a Standard & Poor's ("S & P") 300 industrial firm. *See* First Report ¶ 63, at 33–34 (J.A. 1342–43). Because these S & P firms employ a variety of technologies and enjoy a wide array of market shares, the Hearing Examiners concluded that the risks faced by these firms said little about the risk Bell faced in the market for unbundled network elements. *See* PSC Staff's Post Hearing Br., at 18 (Mar. 7, 1997) (J.A. 1225). Instead, they accepted AT & T's assessment of Bell's risk, which it premised upon the risk experienced by other telephone holding companies. *See id.*

The Hearing Examiners also noted that there was substantial evidence that Bell's cost of capital may have declined since the Commission approved Bell's stipulated cost of capital in 1993. *See* First Order ¶ 61, at 33 (J.A. 1342); PSC Staff's Post Hearing Br., at 21–22 (citing Test. of Dr. Rafferty) (J.A. 1228–29). Such evidence included a proxy statement Bell issued to its shareholders in conjunction with its merger with NYNEX, in which Bell's financial advisor estimated a cost of capital of only eight to ten percent. *See* AT & T Post Hearing Br., at 93–94 (Mar. 7, 1997) (J.A. 1087–88). This estimate was less than that awarded by the Commission. Moreover, Bell has admitted that it will not need new capital investment (and, thus, not incur the costs associated with attracting capital) to sell its network elements at wholesale: "By selling our network services in a wholesale environment,

we can achieve new revenues on our platform **without new capital investment,** while preserving efficiencies of scale and scope." Ex. 12 Attachment 9, at 4 (J.A. 548) (emphasis added); *see also* PSC Staff's Post Hearing Br., at 19–21 (J.A. 1226–28).

Thus, both the infirmities of Bell's cost of equity calculations and the evidence that Bell's cost of capital may have declined support the Hearing Examiners' rejection of Bell's proposed cost of capital.[20] In so deciding, the Hearing Examiners did not abuse their discretion.

### c. Depreciation Rates

■ Like cost of capital, the depreciation rate allowable for plant and equipment is an important component of network element prices. Depreciation allows a company to recover the cost of its investment in a capital asset over time. Depreciation is measured in "useful lives." Generally speaking, shorter depreciation lives result in greater depreciation expense because the cost of the investment is amortized over a shorter period of time. First Report ¶ 74, at 39 (J.A. 1348). This expense is passed on, in the form of higher prices, to purchasers of unbundled network elements.

In its SGAT Order, the Commission adopted the Hearing Examiners' recommendation that it reject Bell's proposed depreciation lives as "unrealistically short" and that it impose the depreciation lives prescribed by the FCC for Bell. *See* SGAT Order ¶ 30, at 17–18 (J.A. 1609–10). Bell argues that these FCC lives are "overly long" and "backward looking" and that they inaccurately reflect the depreciation lives of equipment in a competitive environment—one that forces Bell to replace its equipment more rapidly to keep pace

---

20. Bell also argues that the Hearing Examiners abused their discretion in failing to set a cost of capital reflecting the increased competition posed by the thirty-one authorized providers of local service in Delaware. This argument is without merit because even if such competitors exist, Bell has offered no evidence that these companies compete with Bell in the provision of network elements.

with competitors. *See* D.I. 83 at 20–23. At issue is whether the Commission acted arbitrarily in deciding that the FCC's depreciation lives, rather than Bell's, better reflected TELRIC's forward looking pricing mandates.

As with other components of network element prices, depreciation rates must be "forward-looking" and reflect the "cost ... of providing" the network elements. *See* 47 U.S.C. § 252(d)(1)(A)(i). The FCC pricing rules require depreciation rates to be economic depreciation rates[21] that "account for expected declines in the value of capital goods." *Local Competition Order* ¶ 686, at 347. In its attempt to adopt a forward looking depreciation rate that accurately accounts for declines in the value of capital goods, the Hearing Examiners reviewed the testimony of a number of witnesses, including Bell's expert witness, Dr. Lawrence Vanston and AT & T's expert witness, Dr. Richard Lee. Bell relied on Vanston's testimony as the primary justification for its proposed depreciation lives.

In rejecting Vanston's justifications, the Hearing Examiners sided with AT & T's witness, Lee, and accepted as credible his criticisms of Vanston's analysis.[22] Lee testified that the FCC depreciation lives are forward looking because the FCC's lives reflect "company plans, technological developments and other future oriented analyses." Lee Test. at 5 (J.A. 501) (internal quotation & footnote omitted). Lee also remarked that the FCC has vast experience in promulgating forward-looking depreciation lives for the telecommunications industry. *Id.* Additionally, Lee compared the lives proffered by Bell with the FCC's and concluded that Bell's lives were much too short and, therefore, inappropriate for use in TELRIC calculations. *See* Lee

Test. at 9 (J.A. 505); Lee Test. Attachment 6 (J.A. 533) (comparison chart). He supported this conclusion with an extensive critique of Vanston's testimony and noted that Vanston mischaracterized the FCC lives as backward-looking. *See* Lee Test. at 11–16 (J.A. 507–12) Lee also criticized Bell's depreciation lives as biased in favor of ILECs because the lives were based on studies conducted by a research group funded by Bell and other ILECs. *See* Lee Test. at 10–11 (J.A. 506–07).

It is evident from their First Order that the Hearing Examiners carefully considered both Vanston's and Lee's testimony. Given the extensive criticism leveled against Vanston's analysis of Bell's depreciation lives and the questionable credibility of the ILEC-funded studies supporting those lives, the Hearing Examiners had a rational basis for rejecting Bell's proffered lives. The great expertise of the FCC in promulgating depreciation lives for telecommunications companies also supports the Examiners' decision to adopt the FCC depreciation lives.[23] Accordingly, the court finds that neither the Hearing Examiners nor the Commission acted arbitrarily in adopting those lives as inputs in the calculation of Bell's network element charges.

### 2. The Wholesale Discount

 Under the Telecommunications Act, ILECs also must offer their services (as opposed to their network elements) to new entrants at a discounted, wholesale rate so that these competing carriers may resell those services at a profit to end users. *See* 47 U.S.C. §§ 251(c)(4), § 252(d)(3). Section 252(d)(3) of the Act requires that wholesale rates be calculated on the basis of the retail rates the ILEC charges its own customers minus "any

---

**21.** *See* 47 C.F.R. § 51.505(b)(3). The "economic" life of an asset is its total revenue producing life. *See* Test. of Richard B. Lee at 4 n. 4 (J.A. 500).

**22.** Other parties to the SGAT proceeding also criticized Bell's depreciation lives and Van-

ston's testimony. *See, e.g.,* First Report ¶¶ 74, 77, 79, 80, at 39–41 (J.A. 1348–50).

**23.** Although Bell argues otherwise, the FCC has never repudiated the use of its depreciation lives in TELRIC cost analyses.

marketing, billing, collection, and other costs that will be avoided by" the ILEC when it sells to its competitor at wholesale. Bell argues that this statutory language requires that the wholesale discount must equal the costs actually avoided by the ILEC in providing the service at wholesale rather than retail. The FCC, however, rejected this construction of § 252(d)(3):

> [W]e reject the arguments of incumbent LECs and others who maintain that the LEC must actually experience a reduction in its operating expenses for a cost to be considered "avoided" for purposes of section 252(d)(3). We do not believe that Congress intended to allow incumbent LECs to sustain artificially high wholesale prices by declining to reduce their expenditures to the degree that certain costs are readily avoidable. We therefore interpret the 1996 Act as requiring states to make an objective assessment of what costs are reasonably avoidable when a LEC sells its services wholesale.

*Local Competition Order* ¶ 911, at 456 (emphasis added). In other words, the FCC construed the statutory language to include costs that are avoidable by a hypothetical company that provides only wholesale services. *Id.* ¶ 911; *see also* Peter W. Huber et al., *Federal Telecommunications Law* 524 (2d ed. 1999). Bell chafes at this construction of § 252(d)(3). Tellingly, though, it concedes that the Commission correctly applied the FCC's interpretation of § 252(d)(3) in the instant case.[24] Bell asks the court to withhold decision on this pricing issue until after the Eighth Circuit has reviewed the FCC's interpretation for compliance with the Act.[25] This the court will not do.

Since the reinstatement of the FCC rules by the Supreme Court in *Iowa Utilities,* the FCC rules are binding federal law. The court will not, and need not,

delay these proceedings until the Eighth Circuit (and, presumably, the Supreme Court) pass upon the legality of the FCC's construction of the statute. *Accord GTE South, Inc.,* 199 F.3d at 743–744. Moreover, in light of the substantial deference accorded to agency interpretations of their enabling statutes, a reversal of this particular FCC interpretation by the Eighth Circuit is by no means certain. *See Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778.

Therefore, since Bell concedes that the Commission correctly applied the FCC's reading of § 252(d)(3) to the wholesale discount issue at bar, Bell's challenge to the Commission's decision is without merit. What is more, Bell also concedes that it did not submit evidence to the Commission reflecting its proposed "actually avoided" costs. *See* D.I. 83 at 25 n. 40. It only submitted evidence conforming to the FCC standards, albeit under protest and claiming that the FCC interpretation of § 252(d)(3) was "absurd." *See id.* Nothing, however, prevented Bell from also submitting evidence of its actually avoided costs. Because it did not, Bell cannot now challenge the Commission's decision based on evidence the Commission never had a chance to review. *See Washington Ass'n for Television & Children v. FCC,* 712 F.2d 677, 681 (D.C.Cir.1983) (explaining that, "[o]ur cases ... require complainants, before coming to court, to give the [agency] a 'fair opportunity' to pass on a legal or factual argument").

### B. The Interconnection Appeal

AT & T challenges two non-pricing aspects of the Interconnection Agreement and two related pricing determinations incorporated into the Agreement from the SGAT Proceeding. Following briefing, one of the non-pricing issues (the use of the switching function of collocated remote switching modules) became moot.[26] Thus,

---

24. *See* D.I. 83 at 24, 26; D.I. 85 at 12.

25. The Supreme Court remanded this issue to the Eight Circuit to determine whether the FCC's construction comported with the Act.

26. On March 31, 1999, the FCC issued an order requiring ILECs to permit competitors to use the switching functions of collocated remote switching modules. *See In re Deploy-*

only one non-pricing issue remains. Specifically, AT & T complains that the Commission permitted Bell to restrict AT & T's right to resell services that Bell provides to its largest customers under "customer specific contracts" in violation of the Act's prohibition of "unreasonable or discriminatory conditions or limitations" on the resale of telecommunications services. *See* 47 U.S.C. § 251(c)(4)(B). Of the two pricing issues, AT & T first complains that the Commission in the SGAT Proceeding allowed Bell to assess "unlawfully and wholly unsupported" operations support system ("OSS") charges in addition to the discounted service rates authorized by the Act. Second, AT & T argues that the Commission in its SGAT Order erroneously approved Bell's proposal to assess AT & T "exorbitant" non-recurring charges. Additionally, in its counterclaim/crossclaim Bell alleges that the Interconnection Agreement erroneously classifies certain directory publishing services as "network elements." The court shall address each of these arguments in turn.

 Before addressing the substance of the Interconnection Appeal, the court first must consider the Commission's contention that AT & T and Bell have waived any objection to the Interconnection Agreement. The Commission presents two arguments in support of its waiver theory. First, citing *GTE North, Inc. v. McCarty,* 978 F.Supp. 827, 833–37 (N.D.Ind.1997), it argues that "the Arbitration Award, standing alone, cannot be the basis for, or the subject of, any federal court scrutiny." *See* D.I. 86 at 58. In *McCarty,* however, GTE brought suit challenging an arbitrator's award prior to either the Indiana Commission's approval of that award or its approval of a final interconnection agreement. This is clearly not the case here, where the Delaware Commission approved the Interconnection Agreement and the Arbitrator's awards embodied therein. *See* Interconnection Order ¶¶ 27–28, at 16–18 (J.A. 1765–67). Moreover, Bell and AT & T are not seeking review of the Arbitration Award, but rather the Commission's approval of the Interconnection Agreement.

Second, the Commission contends that both AT & T and Bell encouraged the Commission to approve the arbitrated Interconnection Agreement and, because neither company objected to the arbitrator's awards before the Commission, they are not "aggrieved" parties entitled to judicial review under § 252(e)(6) of the Act. *See* D.I. 86 at 58. It is clear from the administrative record that the Commission delegated the arbitration to the Arbitrator and that both AT & T and Bell raised the issues currently on appeal before him. *See* Arbitration Order ¶ 26, at 15 (J.A. 1764). Because the Commission delegated its arbitration duties, the objections made to the Arbitrator were effectively made to the Commission.[27] Accordingly, the Commission's waiver theory is without merit. The court now turns to the substance of the Interconnection Appeal.

---

ment of Wireline Servs. Offering Advanced Telecomms. Capability, CC Docket No. 98–147, First Report & Order & Further Notice of Proposed Rulemaking, 1999 WL 176601 ¶ 28 (rel. Mar. 31, 1999). Bell has agreed to comply with the order. *See* D.I. 117 at 14. This aspect of AT & T's appeal is therefore moot and will be dismissed without prejudice to refile.

**27.** AT & T also filed a petition with the Commission for reconsideration of the arbitrated non-pricing issues currently on appeal. *See* AT & T Communication's Motion for Reconsideration, PSC Doc. No. 96–331 (May 9,

1997) (J.A. 1485–94). The Commission, due to the time constraints imposed by the Telecommunications Act did not address the motion, even though AT & T urged the Commission to act upon it. *See* Letter from Stabler to Burcat of Sept. 30, 1997 (J.A. 1721–22). In light of those time constraints, AT & T withdrew its motion for reconsideration, noting that their withdrawal was not a " 'waiver' and/or repudiation of AT & T's positions as set forth in the Motion" and that AT & T would "pursue these outstanding issuesoutside of the regulatory are[n]a." Letter from Stabler to Burcat of Oct. 10, 1997, at 1 (J.A. 1738).

### 1. Customer Specific Contracts

 Customer specific contracts are individualized telecommunications "packages" offered to large businesses at rates generally lower than those charged to residential customers and smaller businesses. Typically, Bell and other ILECs offer telephone service through tariffs, which outline the rates generally available to the public. With certain large customers who have specialized telecommunications needs, Bell negotiates specific contracts for the provision of local telecommunications service. In return for lower rates, these customers agree to meet certain requirements, such as a minimum usage volume. No party to this appeal disputes that customer specific contracts are "services" that Bell must "make available" at wholesale to new entrants. *See* 47 U.S.C. § 251(b)(1);(c)(4)(B); *Local Competition Order* ¶ 948, at 470 (explaining that § 251(c)(4)(B) "makes no exception for promotional or discounted offerings, including contract and other customer-specific offerings"); *id.* ¶ 951, at 471. At issue is whether the Commission abused its discretion by approving an interconnection agreement that allegedly imposes discriminatory restrictions on the resale of customer specific contracts in violation of the FCC rules and § 251(c)(4)(B) of the Act.

During the arbitration, Bell and AT & T disagreed about how the former would disclose information about its customer specific contracts to the latter and under what conditions Bell would sell such contracts to AT & T. Bell tried to limit disclosure of its contracts, fearing that AT & T would eschew purchasing the contracts and simply use the disclosed information to solicit Bell's most desirable customers. Bell proposed to offer AT & T either a summary of its customer specific contracts or the contracts themselves with customer-identifying information redacted. *See* Bell Proposed Arb. Award ¶ 3, at 3 (J.A. 1298).

Bell proposed to sell a particular customer service contract to AT & T only after (1) AT & T had identified "the specific profile of customers to which it proposes to resell custom packages" and (2) after Bell and AT & T had jointly evaluated whether "AT & T's customer has the same network and other characteristics and otherwise can satisfy the terms of the contract." [28] *Id.* ¶¶ 3–4, at 3–4 (J.A. 1298–99). AT & T countered with the following proposed Arbitration Award:

> I find that the Act includes no prerequisite that AT & T's customer be "similarly situated" before AT & T can resell a BA–Del customer specific contract to the AT & T customer. Instead, the Act and fundamental fairness requires BA–Del to make full, up-front disclosures of the material terms of its customer specific contracts. If all of the conditions of the contract can be met .... AT & T [is] entitled to purchase such contract at the wholesale discount rate for the purposes of resale to the ultimate customer.... BA–Del shall submit redacted versions of each of its customer specific contracts ....

Reply Comments of AT & T Communications of Delaware, Inc., PSC Doc. No. 96–331, ¶ 9, at 3–4 (J.A. 1264–65).

In discussing these conflicting proposals, the Arbitrator recognized that customer specific contracts are special arrangements that "depend upon certain service characteristics that the customer involved demonstrates." Arbitration Award ¶ 8, at 4 (J.A. 1435). Permitting AT & T to resell a particular customer specific contract to a business that lacks the specific characteristics outlined in the contract would disadvantage Bell because AT & T could bring discounted services to Bell customers that otherwise would not qualify for them. *See id.* The Arbitrator concluded that AT & T should be able to purchase customer specific contracts, but only where AT & T is

---

28. The Arbitrator later criticized this proposal as giving Bell the unfair advantage of knowing the potential customer with whom AT & T

was negotiating. *See* Arbitration Award ¶ 12, at 6 (J.A. 1437).

"willing and able" to meet the **material** terms of the entire customer specific agreement involved. *See id.* ¶ 9, at 4 (J.A. 1435). In other words, AT & T would have to demonstrate that the customer to whom it would resell the customer specific contract would meet the **material** service needs contemplated by the contract. The Arbitrator recognized that Bell could define "material" expansively, thereby elevating every niggling contract detail to a "material" term that AT & T's proposed customer would have to meet to qualify for resale. This would stifle the resale of Bell's customer specific contracts.[29] To foreclose potential disputes, the Arbitrator articulated the following standards for determining the materiality of contract terms:

> An objective and fair standard is to require AT & T's purchase for resale to satisfy the contract's specific requirements as to volume commitment, termination liability, contract term, and any material location or other usage factors that the contract explicitly addresses or that can be inferred with reasonable certainty from ascertainable customer characteristics.

> AT & T cannot resell services of which it is unaware. A practical means for providing notice is clearly required. However, AT & T need not necessarily be made aware of confidential or proprietary information about BA–Del's customers or the specific arrangements that have been reached with them. It needs to know the contract's specific requirements as to volume commitment, termination liability, contract term, and any material location or other usage factors that the contract explicitly addresses or can be inferred with reasonable certainty from ascertainable customer characteristics. This information can be provided through the redacted contract approach that BA–Del proposes.

*Id.* ¶¶ 9–10, at 4–5 (J.A. 1435–36). These standards ultimately found their way into the Interconnection Agreement in the following form:

> AT & T may obtain BA Resale Services pursuant to a customer-specific contract only if AT & T meets all of the material terms of the entire contract (including, but not limited to, the termination liability, contract term, and any other material location or other usage factors that the contract explicitly addresses or that can be inferred with reasonable certainty from ascertainable customer characteristics).

Interconnection Agreement ¶ 45.1.3, at 42 (J.A. 1697). AT & T characterizes this last paragraph as giving Bell blanket authorization to impose, as restrictions on resale of its customer specific contracts, any of a variety of material location or other usage factors contained in a particular contract. *See* D.I. 80 at 27. Relying on the *Local Competition Order* and its implementing regulations, AT & T argues that such restrictions are presumptively unreasonable unless Bell proves to the Commission that each restriction is reasonable and nondiscriminatory. *See* D.I. 80 at 28 (quoting *Local Competition Order* ¶ 939, at 466 and implementing regulations at 47 C.F.R. § 51.613(b)). This, AT & T claims, Bell did not do because Bell failed to "even identify all of the material location or usage criteria that it would 'infer' from 'ascertainable characteristics' of its many [customer service contracts] and seek to impose on AT & T and other resellers . . . ." D.I. 80 at 29.

Neither the *Local Competition Order* nor its implementing regulations require interconnection agreements to specify standards detailed enough to account for each and every term appearing in a customer specific contract. Although the FCC was concerned that incumbents could use contract terms to stymie a new en-

---

**29.** Commentators voiced identical concerns during the notice and comment period prior to the issuance of the *Local Competition Or-* der. *See Local Competition Order* ¶¶ 945–46, at 469.

trant's ability to resell the contract, the FCC also recognized the existence of "reasonable restrictions on promotions and discounts" contained in customer specific contracts. *See Local Competition Order* ¶ 952, at 471. Because it could not predict what conditions or restrictions would be reasonable, the FCC concluded that the "substance and specificity of rules concerning which discount and promotion restrictions may be applied to resellers in marketing their services to end users is **a decision best left to state commissions,** which are more familiar with the particular business practices of their incumbent LECs and local market conditions." *Id.* (emphasis added). Thus, the FCC left the difficult task of sorting the reasonable from the unreasonable to the sound discretion of state commissions.

In the present case, the Commission did not abuse that discretion. The Commission and its Arbitrator faced the difficulty of identifying the material terms of Bell's innumerable customer specific contracts. Recognizing the impossibility of prescribing such rules, the Arbitrator proposed, and the Interconnection Agreement later adopted, specific and general standards. The specific standards require AT & T to satisfy the contract's particular requirements as to volume commitments, termination liabilities, and contract lengths. Because other terms might be material depending upon the customer involved, the Arbitrator wisely permitted some flexibility. Thus, he proposed general standards requiring AT & T to comply with "any material location or other usage factors that the contract explicitly addresses or can be inferred with reasonable certainty from ascertainable customer characteristics." Arbitration Award ¶ 9, at 4 (J.A. 1435). These material location or other usage factors have to be objective and

"ascertainable through straightforward verification by AT & T." *Id.* ¶ 11, at 5 (J.A. 1436). In other words, the materiality of these other factors must be obvious. Where the parties are unable to reach a consensus about the materiality of a given contract term, the Interconnection Agreement specifically allows each party to petition the Commission for relief. *See* Interconnection Agreement ¶ 45.1.3, at 41 (J.A. 1696).[30]

Given the complexity of customer specific contracts, the Interconnection Agreement's approach to determining which terms are material, and which are not, is both sensible and in keeping with the Telecommunications Act and the *Local Competition Order.* Accordingly, the Commission did not abuse its discretion in approving the Interconnection Agreement's provisions relating to customer specific contracts.

### 2. Operations Support Systems Charges

Operations support systems ("OSS") consist of preordering, ordering, provisioning, billing, maintenance and repair functions supported by an ILEC's databases. *See* 47 C.F.R. § 51.319(f). All parties acknowledge that access to OSS is critical for new entrants because OSS determines "in large part, the speed and efficiency" with which a carrier "can market, order, provision, and maintain telecommunications services and facilities." *Local Competition Order* ¶¶ 516–18, at 259–60. In addition to the wholesale rate Bell may charge for its OSS service, the Commission also permitted Bell to charge OSS "access" charges when AT & T uses Bell's OSS to resell Bell's other retail services. *See* SGAT Order ¶¶ 48–51, at 29–31 (J.A. 1621–23). The parties incorporated these access charges

---

30. Specifically, the Agreement states:
 BA may petition the Commission for relief from the requirements of this section ... in circumstances where BA believes that disclosure of information related to a customer-specific contract would be inappropriate.

 AT & T may petition the Commission to require a more specific disclosure if AT & T believes that BA's listing of conditions related to a customer-specific contract is inappropriately broad.

approved in the SGAT Order into the Interconnection Agreement. AT & T complains that the charges violate the Act in three respects. First, AT & T argues that these additional charges contravene the Act's mandate that Bell sell its retail services at wholesale rates only. *See* 47 U.S.C. § 252(d)(3). Second, AT & T claims that these access rates amount to a double-charge for Bell's OSS. Third, the charges allegedly discriminate against AT & T by imposing upon it all of Bell's OSS access costs without requiring Bell to pay any share of such costs.

### a. § 252(d)(3) Does Not Preclude Access Charges

 The court first must address whether § 252(d)(3) prohibits additional access charge fees. Because this involves an interpretation of the Act itself, the court shall review the Commission's decision *de novo*. Section 252(d)(3) reads in its entirety as follows:

> Wholesale prices for telecommunications services. For the purposes of section 251(c)(4) ..., a State commission shall determine wholesale rates on the basis of retail rates charged to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier.

47 U.S.C. § 252(d)(3). AT & T argues that the only relevant costs in determining wholesale charges are those an ILEC can avoid by selling wholesale and not additional costs the ILEC will incur because of its resale obligations, such as access costs.

Section 252(d)(3)'s language does not compel this conclusion. It only makes clear that the starting point for the wholesale rate calculation is the retail rate for the service in question. The Hearing Examiners concluded that the OSS access charge compensates Bell for costs associated with updating its OSS interfaces to permit new entrant access. Assuming the accuracy of this conclusion, these access costs are not included in Bell's retail rate for OSS services because Bell's retail customers do not "access" its OSS. *See* Third Report ¶¶ 5–11, at 3–8 (J.A. 1582–87). As such, there is no allowance for such costs in Bell's retail rates and, consequently, none also in the discounted wholesale rate. Nothing on the face of the Act prohibits imposing an additional charge to compensate Bell for providing OSS access to its competitors. Having concluded that the access charges do not violate the express language of the Act, the court moves on to consider whether the Commission acted arbitrarily in approving such charges.

### b. The Commission Acted Arbitrarily in Approving Bell's OSS Access Charges

 AT & T next argues that the Commission acted arbitrarily in approving the additional, per-transaction OSS access charges because Bell's wholesale rates already include a $66 million cost offset designed to compensate Bell for its OSS access costs. In essence, AT & T accuses the Commission of approving a double cost recovery for Bell. In order to evaluate this charge, it is necessary to review the record below.

Bell's OSS access charges first appeared in its proposed SGAT. *See* Bell SGAT Ex. A, at 9–10 (J.A. 84–85). In their First Report, the Hearing Examiners did not address whether these charges amounted to a "double count." *See* First Report ¶¶ 245–49, at 105–07 (J.A. 1414–16). During oral argument before the Commission, AT & T claimed that Bell's wholesale rates already accounted for its OSS access costs. In light of AT & T's objection, the Commission remanded the "double count" allegation to the Hearing Examiners for further consideration. *See* Interlocutory Order No. 4488, PSC Doc. No. 96–324 ¶ 4(a), at 6 (Apr. 29, 1997) (J.A. 1450) (remanding to consider "[w]hether it is appropriate to assess OSS charges against resellers of wholesale service").

On remand, the Hearing Examiners summarily rejected AT & T's "double count" objections, stating only that "[t]he OSS charges are for a new service, and hence are not reflected in the wholesale discount, which is based upon removing the avoided cost portion of BA–Del's embedded costs." *See* Second Report ¶ 36, at 16 (J.A. 1469). The Examiners cited no record evidence or testimony supporting this conclusion.

Before the Commission, AT & T again attacked the OSS access charge as a double count. AT & T also argued that Bell had not demonstrated how it incurs costs not otherwise recovered in its wholesale OSS rates. *See* Supplemental Br. of AT & T, at 2–3 (May 22, 1997) (J.A. 1500–01). In response, the Commission again remanded the double-count issue to the Hearing Examiners for further consideration. *See* Interlocutory Order No. 4508, at 2 & n. 1 (J.A. 1574).

On further remand, Bell argued that the definitional sections of its proposed SGAT (§§ 2.1.1. and 2.1.2) "make it crystal clear that the OSS charges are for access to BA–Del's operation support systems." Bell Br. on Remand, at 5 (J.A. 1568). Bell did not explain how it arrived at these access costs. Bell argued only that these access costs differed from costs already accounted for by Bell's wholesale rates. Bell relied upon the rebuttal testimony of Edwin Hall who also argued that Bell's proposed SGAT definitional section makes clear that the OSS charges are for access to Bell's OSS. *See id.* at 6 n. 14 (J.A. 1569); Test. of Edwin Hall, at 4–5 (J.A. 829–30). In that testimony, Hall explained that the OSS charge "is designed to recover gateways or interfaces provided for access to these systems, not for the modifications to the systems themselves, which is included in the avoided cost study as new costs." *Id.* at 5 (J.A. 830). Hall did not elaborate on what the systems modifications were or how "modifying" the OSS was meaningfully distinct from adding "gateways or interfaces" to provide access to the OSS. It is not apparent from the record that the Hearing Examiners considered any documentation supporting either this distinction or the legitimacy of separate OSS access costs.

In its Third Report, the Hearing Examiners' analysis of the "double count" issue consisted of nothing more than quoting at length from the parties' briefs. *See* Third Report ¶¶ 5–8, at 3–7 (J.A. 1582–85). Further, they did not cite cost studies supporting Bell's OSS access charges or attempt to distinguish testimony criticizing those cost studies. *See, e.g.,* Test. of Terry L. Murray, at 91–92 (J.A. 673–74). Nor did they address any other evidence contradicting AT & T's claim that Bell's wholesale OSS discount already accounted for its OSS access costs. The Hearing Examiners simply concluded that:

> Based on a thorough review of the parties' testimony and the evidence of record, we previously concluded that there was no double count here, as AT & T had alleged. After reviewing the parties' supplemental briefs on this issue, we continue to find BA–Del's proposed OSS charge does not represent a double count.

Third Report ¶ 9, at 7 (J.A. 1586). The Commission summarily affirmed the Hearing Examiners' decision. *See* SGAT Order ¶ 51, at 30–31 (J.A. 1622–23).

The court must remand this issue because neither the Hearing Examiners nor the Commission cogently addressed how Bell arrived at its OSS access costs or how the costs attributed to OSS access differ from the costs already included in Bell's wholesale rates. It is not enough to say that these additional OSS access charges account for "new services and modifications," such as OSS interfaces, without documenting the evidentiary support for these particular costs. For instance, on the record before it, the court cannot find any documentation supporting the cost distinction between "system modifications" (the cost of which is included in the wholesale discount, *see* Third Report ¶ 8, at 6 (J.A. 1585)) and the modifications neces-

sary for OSS access (the cost of which is apparently not included in the wholesale discount). Because the court cannot determine whether the Commission or its Hearing Examiners examined this cost data (or, indeed, if such data is part of the record), the court is constrained to find that there is no rational connection between the Commission's decision and the evidence of record. *See Time Warner Entertainment Co.*, 56 F.3d at 163. Where an "agency has not considered all the relevant factors, or if the court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course ... is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co.*, 470 U.S. at 743, 105 S.Ct. 1598. Accordingly, the court shall remand to the Commission the question of whether Bell's OSS access charges are already recovered through its wholesale rates.[31]

### 3. Non–Recurring Charges

■ Non-recurring costs ("NRCs") are the one-time expenses incurred by an ILEC when it switches one of its subscribers to a new entrant. *See* SGAT Order ¶ 46, at 27 (J.A. 1619). AT & T and Conectiv[32] argue that the Interconnection Agreement's NRCs (which were proposed by Bell) do not comply with the forward-looking costing standards adopted by the Commission and mandated by the *Local Competition Order.* AT & T contends that forward-looking charges must be based on costs associated with efficient electronic processing systems. According to AT & T, the NRC charges in fact are based on the use of antiquated and more

costly manual service processing systems. The Commission's decision rests on an application of the law to the record evidence and, therefore, the court shall review the Commission's NRC charges under an abuse of discretion standard.

NRC charges, like all network element charges, must be based on the cost of providing the network element. *See* 47 U.S.C. § 252(d). All the parties agree that the *Local Competition Order* required the Commission to set these charges according to the forward-looking costing principles of TELRIC. The NRC charges, then, must "be based on the use of the **most efficient** telecommunications technology **currently available** and the lowest cost network configuration." *See* 47 C.F.R. § 51.505(b)(1) (emphasis added).

The Hearing Examiners' analysis, which the Commission adopted, did not address this regulatory standard. Instead, their analysis focused entirely on the reasonableness of the future mechanization of Bell's **current** manual service order processing system. A glimpse at the Hearing Examiners' Third Report[33] to the Commission is instructive. The Examiners reviewed the testimony of Bell's witness, Sanford, who testified that Bell would mechanize (i.e., automate) its "service order interface" gradually over a five year period of time. *See* Third Report ¶¶ 15–17, at 10–11 (J.A. 1589–90). The Examiners also reviewed the testimony of AT & T's witness, Murray, and concluded that her mechanization schedule was much too "aggressive." *See id.* ¶¶ 16–18, at 10–11 (J.A. 1589–90).

---

**31.** Because the court shall remand this issue, it need not address AT & T's additional argument that the OSS access charges are discriminatory.

**32.** Although not a party to the Interconnection Agreement between AT & T and Bell, Conectiv, like AT & T, takes issue with the Commission's approval of Bell's NRC charges in the SGAT Order. Conectiv filed a separate appeal seeking relief from this aspect of the

Commission's SGAT Order. *See* D.I. 34. Conectiv's arguments mirror those of AT & T. For ease of discussion, the court shall refer to AT & T and Conectiv simply as "AT & T." The court's discussion of the NRC charges shall apply to both AT & T's and Conectiv's claims.

**33.** The Commission twice remanded this issue to the Hearing Examiners for further consideration.

The mechanization of Bell's current internal service order processes is irrelevant to the legal standard for determining network element costs. At no point in their analysis did the Hearing Examiners address Bell's proposed NRC charges in light of "the most efficient telecommunications technology currently available and the lowest cost network configuration." 47 C.F.R. § 51.505(b)(1). There is simply no mention of the "most efficient, currently available" telecommunications technology—even though the Commission since has conceded that Bell's service order processing system does not meet this standard. See D.I. 86 at 53 (noting that, "[t]he assumption of continued manual order processing in the BA–Del studies appears inconsistent with the direction to assume 'most efficient available' technology").

Where, as here, an agency ignores a controlling legal standard, its rulings are arbitrary and capricious. See Florida Power & Light Co., 470 U.S. at 743, 105 S.Ct. 1598. Accordingly, the court shall remand the NRC charge issue to the Commission for renewed evidentiary hearings consistent with the Local Competition Order and its implementing regulations, specifically 47 C.F.R. § 51.505(b)(1).

### 4. Directory Publishing Services

In its counterclaim/crossclaim against the Commission and AT & T arising out of the Interconnection Agreement, Bell argues that the Commission (and its Arbitrator) erred as a matter of law in deciding that certain directory publishing services are "network elements" that Bell must sell to AT & T at cost-based rates.[34] See Arbitration Award ¶¶ 16–18, at 7–8 (J.A. 1438–39). Two types of directory services are at issue: (1) the ability to purchase from Bell additional directory listings in the "white pages" and (2) directory services that render customers' telephone numbers "unlisted" or "unpublished."[35] The court shall review the Commission's interpretation of "network elements" de novo.

The Telecommunications Act defines "network elements" as

> a facility or equipment used in the provision of telecommunications service. Such term also includes features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service.

47 U.S.C. § 153(29). The Supreme Court has recognized that this definition is broad and that a network element need not be "part of the physical facilities and equipment used to provide local phone service." Iowa Utils. Bd., 119 S.Ct. at 734 (upholding the FCC's determination that operator services and directory assistance are network elements). The Local Competition Order also states that "network elements" include the "features, functions, and capabilities of the switch," which provide customers with "a telephone number, **directory listing,** dial tone, signaling, access to

---

**34.** After deciding that Bell must sell its directory publishing services at cost-based rates, the Arbitrator decided to use the wholesale rates as a proxy because the actual cost of these services had not yet been set. Bell does not appear to complain about the use of this proxy cost. To the extent that it does, the court finds that the Commission did not abuse its discretion in adopting the proxy rates. The Act allows the Commission to set rates based on the best evidence available to it, which in this case it did. See 47 U.S.C. § 252(b)(4)(B).

**35.** Bell explains that additional directory listings, unlike primary directory listings, are not provided free of charge to consumers. Bell also explains that an "unlisted" number is absent from the published telephone directory, but not from the directory assistance database. An "unpublished" number is deleted from both the published directory and the directory assistance database. See D.I. 83 at 28 n. 43. Unpublished and unlisted numbers are a service provided for a fee to retail customers.

911, operator services and directory assistance." *Local Competition Order* ¶ 412, at 204 (emphasis added & footnote omitted).

Given the broadness of the definition of "network element" and the fact that basic directory listings fall under that definition, it makes sense to include within that definition additional directory listings and non-publication of subscriber numbers. *Accord AT & T Communications of Va., Inc. v. Bell Atlantic–Virginia, Inc.*, 197 F.3d 663, 674-675 (4th Cir.1999); *MCI Telecomms. Corp. v. Bell Atlantic–Virginia, Inc.*, Civ. Action No. 3:97CB629, slip op., at 21–22 (E.D.Va. Jul. 1, 1998). As AT & T notes, customers often request additional listings or unlisted/unpublished phone numbers. If a new entrant could not purchase these services from an ILEC at unbundled, cost-based rates, it would be at a competitive disadvantage. *See Bell Atlantic–Virginia, Inc.*, 197 F.3d at 674-675. Such a result would run counter to the Act's procompetitive goals. Therefore, the court shall affirm the Commission's inclusion of these directory publishing services in the Act's definition of network elements.

## VII. CONCLUSION

For the aforementioned reasons, the court shall deny the Commission's motion to dismiss and Bell's motion for summary judgment. The court also shall deny Bell's crossclaim/counterclaim against the Commission and AT & T. With respect to AT & T's and Conectiv's affirmative claims, the court shall remand the OSS access charge and the NRC charge issues to the Commission for further proceedings consistent with this opinion. An appropriate order shall issue.